924 So.2d 20 (2006)
Donald Eldrenal JENKINS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D03-4713.
District Court of Appeal of Florida, Second District.
January 25, 2006.
Rehearing Denied April 5, 2006.
*22 James Marion Moorman, Public Defender, and Carol J.Y. Wilson, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Tiffany Gatesh Fearing, Assistant Attorney General, Tampa, for Appellee.
CANADY, Judge.
Donald Eldrenal Jenkins appeals his judgment and sentence for possession of cocaine with intent to sell or deliver. Jenkins entered a no contest plea, reserving the right to appeal based on the trial court's denial of a dispositive motion to suppress cocaine seized by the police. Jenkins contends that the trial court's denial of the motion to suppress was erroneous because: (1) the information provided to the police by a confidential informant did not give the police probable cause to arrest Jenkins and (2) Jenkins was subjected to a strip search which violated the requirements of the Fourth Amendment as well as the Florida statute governing strip searches. We conclude that the police had probable cause to search and arrest Jenkins and that the manner of the search of Jenkins' person did not violate the Fourth Amendment. We further conclude that although the search of Jenkins violated the requirements of Florida's statute governing strip searches, suppression of evidence is not a remedy for violation of the statute.

I. BACKGROUND
At the hearing on the motion to suppress, testimony was given by Tampa Police Department officers, as well as by Jenkins, concerning the circumstances which led to Jenkins' arrest. Officer Kellie Daniel testified that she "was working with a confidential informant" with whom she had successfully worked in the past. According to Daniel, the informant advised her that he knew a man named "D" from whom the informant had previously received "dope" and whom he could call on the phone to "order a quantity of cocaine." Using Daniel's cell phone, the informant called "D" and ordered cocaine, while Daniel was listening to the informant's "side of the conversation." The informant related to Daniel that "D" would be going to the Texaco station at the intersection of Nebraska and Osborne in about fifteen minutes and that "D" would "be driving a brown boxy 4-door Chevy." The informant provided no further information regarding the suspect other than "a vague description of a tall black male."
The Texaco station was "directly across the street" from where Daniel was located. Daniel "had full view of the Texaco." Subsequently, the informant, after seeing a 4-door brown Chevy pulling into the Texaco Station, came "running across the street" from the station, telling Daniel, "`that's him, that's him.'" When the Chevy parked in the parking lot by the Texaco Station, Daniel "ordered units to move in where *23 the vehicle was located, at which time the vehicles moved in and detained the suspect."
Daniel also testified that the area of the Texaco Station is one "known for drugs." She explained her prior experience with the informant: "I've used him in similar page-outs where we've arrested, gotten a quantity of dope," as well as "in search warrant buys." Daniel testified that she had "used [the informant] about three or four times" in incidents similar to that involved in the instant case. With one exception, those incidents resulted in an arrest. The exception involved circumstances where the suspect "got spooked" and fled because he observed law enforcement.
According to the testimony of Officer Todd Rego, he "took [Jenkins] out of the car at gunpoint," and "placed handcuffs on him." Rego testified that he "felt we had probable cause [Jenkins] was about to commit a felony" but that he "was just detaining him."
Officer Kevin Bonollo testified that he arrived on the scene as Officer Rego was assisting Jenkins out of the car. According to Bonollo, he searched the car but did not find anything. He then searched Jenkins but "was unable to find any narcotics on his person." Bonollo was then advised by Sergeant Grahamthe supervising officer "`to see if [the cocaine] was inside [Jenkins'] clothing anywhere.'" Bonollo testified:
I opened up the defendant's boxer shorts and inside his butt crack sticking up was a sandwich bag, like a regular Ziploc type of sandwich bag and it was twisted. The dope, the crack cocaine was at the bottom. It was twisted up[,] and I could see the top of the plastic about two inches.
Bonollo testified that he then pulled out the plastic bag containing the cocaine.
Jenkins gave testimony conflicting with Officer Bonollo's testimony concerning the retrieval of the plastic bag containing the cocaine. According to Jenkins, Bonollo "ordered [him] to pull down [his] pants and bend over." Jenkins testified that when he did not comply, the officers forced him to comply by grabbing him from each side, pulling him over, and bending him down. Jenkins further testified he was "completely naked in the buttocks area" when the officers "dropped [his] pants to [his] knees. . . and pulled [his] boxers down."
At the conclusion of the hearing on the motion to suppress, the trial court concluded that "[t]here was probable cause to do a search based on what [the court] heard from the police officers." The court also found that "[t]here was no strip search, not what is typically called a strip search."

II. ARGUMENT ON APPEAL
For his first point on appeal, Jenkins argues that his seizure and the search by the police were illegal because there was no probable cause for his arrest. He contends that the prior dealings of the police with the confidential informant were insufficient to establish the informant's reliability, that it was "impossible for the police to verify the CI's information in any meaningful fashion," and that "there was not enough detail from the CI to establish probable cause that the car occupant was engaging in the criminal activity of selling cocaine."
The State argues that the totality of the circumstances supported the existence of probable cause to detain and search Jenkins. Specifically, the State contends that the prior experience the police had with the informant demonstrated the informant's "accuracy and reliability," and that the "information of future behavior" given by the informant in the instant case "further *24 confirm[ed] the confidential informant's veracity, reliability[,] and basis of knowledge."
For his second point on appeal, Jenkins argues that the trial court erred in concluding that he was not subjected to a strip search. Jenkins contends that the police violated the provisions of section 901.211, Florida Statutes (2003), regarding the performance of strip searches, as well as his constitutional right of privacy.
On this point, the State argues that in this case "the officers conducted a seizure, not a strip search." The State further argues that even if a strip search was performed, it was in compliance with the provisions of the statute and that under the totality of the circumstances the conduct of the police was reasonable and thus did not violate the Fourth Amendment.

III. ANALYSIS

A. The Basis for the Search

The existence of probable cause justifying a warrantless arrest depends on whether, when the arrest was made, "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person arrested] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Determining whether the probable-cause standard is met requires an evaluation of "the totality of the circumstances." Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).
The "identification of [a] suspect by a reliable informant may constitute probable cause for arrest where the information given is sufficiently accurate to lead the officers directly to the suspect." Wong Sun v. United States, 371 U.S. 471, 480, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). When the police rely on information from a confidential informant, they must have some basis for establishing the informant's reliability, but there is no "require[ment] that informants used by the police be infallible." Illinois v. Gates, 462 U.S. 213, 246 n. 14, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
"[A]n informant's `veracity,' `reliability[,]' and `basis of knowledge' are all highly relevant in determining the value of his report." Gates, 462 U.S. at 230, 103 S.Ct. 2317. But "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case." Id. "[A] deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id. at 233, 103 S.Ct. 2317. The "corroboration of major portions" of an informant's "predictions" is a salient indicia of reliability. Id. at 246, 103 S.Ct. 2317. A "[confidential informant's] veracity can be established by either the [informant's] prior record of reliability or the wealth of detailed, verifiable information given on the occasion in question." State v. Walker, 898 So.2d 198, 200 (Fla. 2d DCA 2005).
Here, the reliance of the police on the information provided by the informant was supported both by the informant's prior performance as a reliable source and by the corroboration of the informant's predictions concerning the behavior of the defendant. In the circumstances present here, the police had "reasonably trustworthy information" which was "sufficient to warrant a prudent man in believing that [Jenkins] had committed or was committing an offense." Beck, 379 U.S. at 91, 85 S.Ct. 223.
*25 Contrary to Jenkins' argument, nothing in the prior experience of the police with the informant raised any concerns about the reliability of the information provided by the informant in the past. The fact that a prior transaction was not consummated because the suspect involved in that transaction became suspicious and bolted does not indicate that the information provided by the informant was unreliable.
This case is distinguishable from cases in which an informant has previously simply participated in controlled buys of illicit drugs by acting as "an assistant to law enforcement rather than as a supplier of information" and there is "no record evidence. . . identif[ying] past information provided by" that person, "the value" of that information, or "the manner in which it was verified." Mitchell v. State, 787 So.2d 224, 227 (Fla. 2d DCA 2001). Here, the testimony established that the informant had previously provided the police with information in circumstances similar to the instant casethat is, where the informant identified a suspect who was selling drugs and then arranged to purchase drugs from the suspect. In addition, the police heard the informant arrange a drug transaction, after which the informant predicted that a vehicle matching the description of Jenkins' vehicle would shortly arrive at the Texaco Station. When the vehicle arrived as predicted, the police were able to corroborate a crucial element of the information provided by the informant. The informant then specifically identified Jenkins as the suspect with whom the drug transaction had been arranged. Under the totality of the circumstances present here, the police had probable cause to arrest Jenkins.

B. The Timing of the Search

"[I]n the case of a lawful custodial arrest a full search of the person" without a warrant is permissible under the Fourth Amendment. United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). "[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "`Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion.'" Robinson, 414 U.S. at 232, 94 S.Ct. 467 (quoting People v. Chiagles, 237 N.Y. 193, 142 N.E. 583, 584 (1923)).
The failure of the police formally to arrest Jenkins prior to carrying out the search of his person did not affect the validity of the search. "A valid search of a person may occur incident to a valid arrest, even when the search precedes the arrest." State v. Pringle, 499 So.2d 75, 76 (Fla. 2d DCA 1986). Probable cause must, of course, exist prior to the search. But once there is "probable cause to place [a defendant] under arrest," and "the formal arrest follow[s] quickly on the heels of the challenged search of [the defendant's] person," it is not "particularly important that the search preceded the arrest rather than vice versa." Rawlings v. Kentucky, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).
We thus turn to the issue of the particular manner in which the search was carried out.

C. The Manner of the Search

In considering the legality of the search of Jenkins' person performed by the officers, we begin with the trial court's finding that "[t]here was no strip search, not what is typically called a strip search." It is evident from this finding that the trial *26 court credited the testimony of the officers concerning the manner in which the search was performed and discredited Jenkins' testimony that the officers "dropped [his] pants to [his] knees . . . and pulled [his] boxers down." Accordingly, we proceed with the analysis of the legality of the search based on the officers' description of the manner of the search which constitutes the historical facts found to exist by the trial court. See Ornelas v. United States, 517 U.S. 690, 696-97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
The legality of the manner of the search is subject to evaluation under two standards: (1) the Fourth Amendment mandate that searches be reasonable and (2) the requirements of section 901.211 concerning the performance of strip searches.

(1) The Requirements of the Fourth Amendment

Under the Fourth Amendment, the authority to conduct a search arising from the probable cause to arrest the subject of the search is not an unfettered authority. A search is subject to the test of reasonableness, not only with respect to its inception but also with respect to its scope and the manner of its execution. In Bell v. Wolfish, 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court held that the practice at a federal Bureau of Prisons short-term custodial facility of conducting visual body cavity searches after contact visits did not violate the Fourth Amendment. In analyzing the searches at issue, the Court employed a balancing test:
The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
Id. at 559, 99 S.Ct. 1861.
An examination of the circumstances of the search of Jenkins, in light of the factors employed in the balancing test enunciated in Wolfish, leads us to conclude that the search was reasonable under the Fourth Amendment. The "scope of the particular intrusion" was limited, and the "manner in which it [was] conducted" was restrained. The search was less invasive than a strip search in which some or all of the subject's clothing is removed. The invasion of Jenkins' privacy was significant, but the seriousness of the invasion was not equivalent or similar to the invasion of privacy involved in a typical strip search. In determining the reasonableness of the search, it is of course important that no private part of Jenkins' body was exposed to public view.
Although the search was unquestionably more intrusive than the typical search incident to arrest, the officers had a reasonable basis for initiating the search and conducting it in the manner in which it was performed before transporting Jenkins to jail. The officers had probable cause to believe that Jenkins had come to the scene with cocaine to sell. Only after their initial efforts to find the cocaine on Jenkins' person and in his vehicle were unavailing did the officers conduct the further more invasive search of Jenkins' person. The officers thus had a particularized basis for believing that Jenkins had cocaine concealed on his person. On that basis, they were justified in conducting the further search of Jenkins' person to prevent the disposal of the cocaine by Jenkins.
In conducting the search, the officers properly balanced "the need for the particular search against the invasion of [Jenkins'] personal rights that the search entail[ed]." *27 Wolfish, 441 U.S. at 559, 99 S.Ct. 1861. Accordingly, the search was reasonable under the Fourth Amendment. See United States v. Williams, 209 F.3d 940, 944 (7th Cir.2000) (upholding search where officer "felt a hard object between the cheeks of [the defendant's] buttocks," then "retrieved the object by sliding his hand under [the defendant's] waistband and down the back part of his pants," and the "seizure of the drugs did not add significantly to [the defendant's] invasion of privacy"); United States v. Alexander, 755 F.Supp. 448, 454 (D.C.Dist.1991) (upholding search "in which [officer] reached inside [defendant's] underwear on a public sidewalk"); State v. Jenkins, 82 Conn.App. 111, 842 A.2d 1148, 1158 (2004) (upholding search where officers took defendant "away from the street and out of public view" and "pulled his pants and underwear away from his body specifically to retrieve the glassine packets [the officer] discovered and suspected were there from the patdown of the defendant"); State v. Smith, 342 N.C. 407, 464 S.E.2d 45 (1995) (adopting reasoning of dissent in State v. Smith, 118 N.C.App. 106, 454 S.E.2d 680, 687 (1995) (Walker, J., concurring in part and dissenting in part)) (upholding search where officer slid down defendant's underwear in search conducted in public street behind door of defendant's car).

(2) The Requirements of Section 901.211

(a) The Statutory Provisions

Section 901.211 provides:
(1) As used in this section, the term "strip search" means having an arrested person remove or arrange some or all of his or her clothing so as to permit a visual or manual inspection of the genitals; buttocks; anus; breasts, in the case of a female; or undergarments of such person.

(2) No person arrested for a traffic, regulatory, or misdemeanor offense, except in a case which is violent in nature, which involves a weapon, or which involves a controlled substance, shall be strip searched unless:
(a) There is probable cause to believe that the individual is concealing a weapon, a controlled substance, or stolen property; or
(b) A judge at first appearance has found that the person arrested cannot be released either on recognizance or bond and therefore shall be incarcerated in the county jail.
(3) Each strip search shall be performed by a person of the same gender as the arrested person and on premises where the search cannot be observed by persons not physically conducting or observing the search pursuant to this section. Any observer shall be of the same gender as the arrested person.
(4) Any body cavity search must be performed under sanitary conditions.
(5) No law enforcement officer shall order a strip search within the agency or facility without obtaining the written authorization of the supervising officer on duty.

(6) Nothing in this section shall be construed as limiting any statutory or common-law right of any person for purposes of any civil action or injunctive relief.
(Emphasis added).

(b) Interpreting the Definition of Strip Search

In applying this statute, we are required to "give effect to the plain and ordinary meaning of the language used by the Legislature." State v. Sousa, 903 So.2d 923, 928 (Fla.2005). "We should look at the statutory structure and hear the words as they would sound in the mind *28 of a skilled, objectively reasonable user of words." Frank H. Easterbrook, The Role of Original Intent in Statutory Construction, 11 Harv. J.L. & Pub. Pol'y, 59, 65 (1988).
The definition of strip search contained in subsection (1) is quite expansive. It includes "having an arrested person . . . arrange some or all of his or her clothing so as to permit a visual . . . inspection of the . . . buttocks . . . or undergarments of such person." The phrase "having an arrested person . . . arrange some or all of his or her clothing" cannot reasonably be understood to be limited to circumstances where the arrested person himself acts to "arrange" his clothing. Placing such a literalistic construction on the text would be inconsistent with the sense in which a reasonable user of the English language would understand the import of the provision. The statutory language thus encompasses circumstances where an arrestee is required by the police to submit to the rearrangement of his clothing "so as to permit a visual . . . inspection of . . . [his] buttocks . . . or undergarments." The State does not suggest otherwise.
Nor does the State suggest that section 901.211 is inapplicable due to the circumstance that Jenkins was not formally arrested prior to the search. Although the definition of "strip search" in the statute only covers searches of "an arrested person," see § 901.211(1), in this context "arrested" should not be interpreted restrictively. In its broadest sense, arrest means "[a] seizure or forcible restraint." Black's Law Dictionary 116 (8th ed. 2004). At the time of the search, Jenkins unquestionably had been subjected to "forcible restraint" and was thus "an arrested person" within the meaning of the statute.
In the instant case, according to the testimony of the officers, Jenkins was forced to submit to the rearrangement of his clothing by the officer for the purpose of facilitating "visual . . . inspection" of his buttocks. We conclude that the officers' description of the search established that the search was a "strip search" within the meaning of section 901.211. Although the search of Jenkins does not correspond to the common conception of what is involved in a strip search, the search nonetheless falls within the scope of the expansive definition of "strip search" set forth in section 901.211(1).
We reject the State's argument that the actions of the police did not constitute a "search" but instead constituted a "mere seizure" of evidence. In making this argument, the State relies on our decision in State v. Days, 751 So.2d 87 (Fla. 2d DCA 1999). In Days, we "distinguish[ed] a `strip search' from a mere seizure of the evidence." Id. at 88. The critical circumstance in Days was that the police officer observed the defendant placing a plastic bagcontaining what the officer believed to be illicit drugsin the defendant's crotch area. See id. We concluded that in such circumstances there was no strip search because there was no "inspection" within the meaning of section 901.211(1). See id. In Days, the police were simply seizing evidence they had already observed; they were not conducting an "inspection" to find evidence.
Here, however, the police had not observed Jenkins place anything in his clothing. The officer's purpose in rearranging Jenkins' clothing was not simply to carry out a seizure of previously observed evidence; instead, the officer's purpose was to conduct an inspection in search of possible evidence. Jenkins was forced to submit to the "arrange[ment of] some . . . of his . . . clothing . . . so as to permit a visual . . . inspection of . . . [his] buttocks." § 901.211(1). Accordingly, the statutory *29 requirements with respect to the performance of strip searches were applicable.[1]

(c) The Requirement for Privacy

In determining whether the requirements of the statute were satisfied, of particular relevance here is the requirement of subsection (3) that "[e]ach strip search . . . be performed . . . on premises where the search cannot be observed by persons not physically conducting or observing the search pursuant to [section 901.211]." The testimony of the officers shows that the strip search of Jenkins was performed in the parking lot beside a service station adjacent to the intersection of two public thoroughfares. There is no indication in the record that any measures were taken to shield the search of Jenkins from public view. From the testimony given by the officers, we conclude that the strip search did not meet the requirement of subsection (3) that strip searches be performed only "where the search cannot be observed by" the public. The fact that Jenkins' unclothed buttocks were not exposed to public view is not sufficient to establish compliance with subsection (3). The statute requires that a strip search be performed out of public view, not merely that the areas of the body enumerated in subsection (1) be shielded from public view.[2]

(d) The Exclusionary Rule

The final question we must address concerning the application of section 901.211 is whether evidence obtained in the course of a violation of the statute is subject to suppression under the exclusionary rule. The exclusionary rule is typically applied as a remedy for constitutional violations. See United States v. Smith, 196 F.3d 1034, 1040 (9th Cir.1999) ("The use of the exclusionary rule is an exceptional remedy typically reserved for violations of constitutional rights."); see also United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (stating that exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effects"); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (same).
It has, of course, long been recognized that the violation of a statute is the basis for excluding evidence where the statute provides for the exclusion. See Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937) (holding that where telephone message was intercepted in violation of Federal Communications Act the "plain words" of the statute prohibited "recit[ation] [of] the contents of the message in testimony before a court"). But the commission of a statutory violation does notin the absence of a statutory rule of exclusionnecessarily require application *30 of the exclusionary rule. See United States v. Lombera-Camorlinga, 206 F.3d 882, 887 (9th Cir.2000) ("[T]he infrequency with which we have allowed an exclusionary remedy for a non-constitutional [sic] harm belies [the] claim that exclusion is the normal or default rule in such circumstances."); cf. United States v. Caceres, 440 U.S. 741, 755, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (holding that in criminal prosecution "precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application" with respect to the violation of an IRS regulation concerning recording conversations between agents and taxpayers).
There is certainly no constitutional requirement that evidence obtained in violation of state law must be subjected to the exclusionary rule. See California v. Greenwood, 486 U.S. 35, 45, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) ("[T]he people of California could permissibly conclude that the benefits of excluding relevant evidence of criminal activity [obtained in violation of state law] do not outweigh the costs when the police conduct at issue does not violate federal [constitutional] law."). Instead, deciding whether to employ the exclusionary rule as a remedy for a statutory violation is a matter of statutory interpretation. The question is thus whether a particular statutory scheme authorizeseither expressly or by implicationthe exclusion of evidence for a statutory violation.
In D.F. v. State, 682 So.2d 149 (Fla. 4th DCA 1996), the court held that evidence obtained in a strip search conducted in violation of the requirements of subsections (3), (4), and (5) of section 901.211 must be suppressed. Citing Gulley v. State, 501 So.2d 1388, 1391 (Fla. 4th DCA 1987), which dealt with the admissibility of DUI test results, the court in D.F. observed that "[t]he courts of this state have uniformly held test results obtained in violation of statutory directives to be inadmissible." 682 So.2d at 153.
The court went on to state, "Given both the historical purpose of the exclusionary rule and the substantial statutory violation of the statute, suppression of the cocaine obtained by the unlawful strip search is an appropriate remedy." Id. at 154. In reaching this conclusion, the court reasoned that the language of section 901.211(6) concerning civil actions and injunctive relief did "not evince a legislative intent to limit the sanctions imposed by the trial courts for statutory violations." Id. at 153. Accordingly, the court concluded: "We discern no intent on the part of the legislature to limit the court's ability, in the appropriate case, to suppress the results of a strip search obtained in violation of the statute." Id.[3]
Certain statutes adopted by the Florida Legislature expressly provideunlike section 901.211for the exclusion of evidence obtained in violation of statutory requirements. For example, section 934.06, Florida Statutes (2005), provides that the content of illegally intercepted wire or oral communications and evidence derived from such communications may not "be received in evidence in any trial" or other proceeding. See also § 934.01(2); Davis v. State, *31 529 So.2d 732 (Fla. 4th DCA 1988); Nardone, 302 U.S. at 382, 58 S.Ct. 275.
Similarly, the statutory scheme governing DUI breath and blood tests contains provisions requiring the exclusion of evidence obtained in violation of the statute. Section 316.1934(3), Florida Statutes (2005), provides that in order for the chemical analysis of a DUI breath or blood test to be "considered valid," the analysis "must have been performed substantially in compliance" with requirements established under the statutory scheme. This statutory provision has been recognized as "an exclusionary rule prohibiting the use" of test analyses conducted in a manner "contrary to [the statute's] core policies." Robertson v. State, 604 So.2d 783, 789 (Fla. 1992). From the legislative declaration that certain test results are not valid, it follows ineluctably that those test results may not be admitted into evidence.
In addition, section 316.1934(2) provides that "the results of any test administered in accordance with" the pertinent statutory provisions "are admissible into evidence when otherwise admissible." Subject to the specific provisions of the statutory scheme recognizing the sufficiency of "substantial compliance," the statutory authorization for the admission of the results of tests "administered in accordance" with statutory requirements can only be understood as entailing that test results not "administered in accordance with statutory requirements" not be "admissible into evidence." See State v. Miles, 775 So.2d 950, 956 (Fla.2000).
These statutory provisions provide the context for the decision in Gulley, on which the court relied in D.F. Given the express statutory provisions requiring the exclusion of DUI test results obtained in violation of the statute, we find the reliance by the D.F. court on Gulley unpersuasive. The application of an exclusionary rule established by specific statutory provisions does not support the application of an exclusionary rule in another statutory context where the statutory text provides no explicit basis for application of that rule.
We recognize that the exclusionary rule has, however, also been employed as a remedy for statutory violations where the statute is silent concerning the remedies available for violations. The Florida case law contains two salient examples. One involves the statutory requirement for notice to a person whose confidential medical records are sought by subpoena. The other involves statutory knock-and-announce provisions.
In State v. Johnson, 814 So.2d 390, 394 (Fla.2002), the court dealt with whether the exclusionary rule should be applied as a remedy for the State's violation of the notice provision of section 395.3025(4), Florida Statutes (1997), which provides for disclosure of confidential medical records pursuant to a subpoena. The statute specifically provides for the giving of "proper notice by the party seeking such records to the patient or his or her legal representative." § 395.3025(4)(d). In Johnson, the State had made some efforts to obtain a current address of the defendant in order to give her the notice required by the statute. Johnson, 814 So.2d at 392. Those efforts were, however, less than exhaustive and ultimately unsuccessful. Id.
The court observed that the exclusionary rule is a "judicially created remedy . . . designed to discourage governmental misconduct and safeguard against future violations." Johnson, 814 So.2d at 394. It went on, however, to reject the Second District's ruling that had precluded admission of the medical records. Id. The court held that the exclusionary rule generally is applicable to violations of the statute but that it should not be applied where there *32 has been a good faith effort to comply with the statute: "Although the exclusionary rule can serve its historic purpose when the State does not make a good faith effort to comply with the procedural requirements of section 395.3025, we do not find that to be the case in this instance." Id. The court emphasized the State's efforts to comply with the statute: "An important consideration in this case is the State's repeated attempts to meet the statutory requirements, and the fact that some of the effort was misdirected is not dispositive and should not result in a per se rule that prohibits future compliance." Id. (footnote omitted).
The statute at issue in Johnson was silent concerning the remedies available for the enforcement of the statutory requirements. In the absence of any legislative action with respect to remedies for violations of the statute, the Johnson court recognized the appropriateness of employing the exclusionary rule as an enforcement mechanism where the State makes no good faith effort to comply with the statute's notice requirement. Although Johnson expresses a willingness to use the exclusion of evidence as a remedy for the violation of statutory requirements where the legislature has not addressed the issue of remedies, it by no means establishes a broadly applicable exclusionary rule for all statutory violations.
Section 933.09, Florida Statutes (2005), contains a knock-and-announce requirement for the execution of search warrants; section 901.19(1), Florida Statutes (2005), contains the same requirement with respect to entry to make an arrest. The exclusionary rule has been applied as a remedy for violations of these knock-and-announce statutory provisions. See Benefield v. State, 160 So.2d 706, 711 (Fla.1964) (applying exclusionary rule to evidence obtained in violation of knock-and-announce requirements of section 901.19(1), Florida Statutes (1959)); State v. Robinson, 565 So.2d 730, 732 (Fla. 2d DCA 1990) ("Both the trial court and this court are required to use the exclusionary rule as the remedy for any violation of the [knock-and-announce requirements] of section 933.09, Florida Statutes (1987). This judicially created remedy was announced as a matter of common law in Benefield. This common law exclusionary rule is based on the sanctity of the home and the need for privacy.").
The knock-and-announce provisions, like section 395.3025(4), are silent with respect to the remedies that are available for their enforcement. The application of the exclusionary rule in this statutory context must be understood in the context of the deepseated common law and Fourth Amendment concerns raised by unannounced entries. See Wilson v. Arkansas, 514 U.S. 927, 930, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); Sabbath v. United States, 391 U.S. 585, 589-90, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); Miller v. United States, 357 U.S. 301, 306-09, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); State v. Bamber, 630 So.2d 1048, 1051-52 (Fla.1994).
Aside from D.F., none of the foregoing cases in which the exclusionary rule has been applied for a statutory violation involved a statute which addressed the issue of remedies but made no provision for the exclusion of evidence obtained in violation of the statute. The cases deal with statutes that either (a) are silent on the question of remedies or (b) make specific provision for the exclusion of evidence. In the instant case, however, the legislature explicitly addressed the issue of remedies in section 901.211(6) but failed to make any mention of the exclusion of evidence as a remedy. No Florida authority identified by the parties to this appealwith the sole exception of D.F.supports the judicial *33 imposition of the exclusionary rule in such circumstances.
In State v. Esquivel, 987 S.W.2d 481, 482 (Mo.Ct.App.1999), the court considered a claim that the exclusionary rule was a proper remedy for the violation of the Missouri strip search statute, a statute similar to the Florida statute. The court rejected the argument for application of the exclusionary rule:
The General Assembly did not mandate the exclusion of evidence in a criminal suit for a violation of [the strip search statute]. [A related statutory provision] provides that a person who suffers actual damages as a result of a violation of [the strip search statute] may initiate a private civil action to recover damages, but it does not mandate suppression of the evidence.
Id. at 483.
It is true that the Florida statutory schemeunlike the Missouri scheme simply acknowledges that existing remedies are unaffected by the adoption of the statutory provisions. See § 901.211(6). But this is not a material distinction. Both the Florida statute and the Missouri statute evidence that the respective legislatures were attentive to the question of remedies. Both statutes specifically address the availability of remedies for aggrieved parties. And neither statute authorizes the exclusion of evidence as a remedy.
The existence of a statutory provision acknowledging the availability of remedies other than the remedy of excluding evidence militates strongly against the conclusion that the statute by implication authorizes the exclusionary rule as a remedy. See D.F., 682 So.2d at 154, 155 (Farmer, J., dissenting) (stating that the inclusion of the provision relating to remedies in section 901.211(6) "makes clear to me that the legislature intended for damages to be the remedy if the statute is ignored"); United States v. Thompson, 936 F.2d 1249, 1251-52 (11th Cir.1991) (holding that exclusionary rule was not applicable as remedy for statutory violation and stating that where "Congress specifically designates a remedy for one of its acts, courts generally presume that it engaged in the necessary balancing of interests in determining what the appropriate penalty should be"); United States v. Michaelian, 803 F.2d 1042, 1049 (9th Cir.1986) (expressing "reluctance to imply a judicial remedy for violations of [a statute] given Congress'[s] explicit provision of a remedy"); see also People v. Hawkins, 468 Mich. 488, 668 N.W.2d 602, 609 (2003) (holding that exclusionary rule was not applicable to evidence obtained pursuant to warrants issued in violation of statute and court rule, and stating that "[w]hether the exclusionary rule should be applied to evidence seized in violation of a statute is purely a matter of legislative intent"); cf. City of Kettering v. Hollen, 64 Ohio St.2d 232, 416 N.E.2d 598, 600 (1980) (discussing policy enunciated by court "that the exclusionary rule would not be applied to statutory violations falling short of constitutional violations, absent a legislative mandate requiring the application of the exclusionary rule"); Winfrey v. State, 78 P.3d 725, 729 (Alaska App.2003) ("`[W]hen the government has violated a statute (as opposed to the Constitution), suppression of evidence has generally been imposed only when the government's violation of the statute demonstrably prejudiced a defendant's ability to exercise related constitutional rights or to prepare or present a defense.'" (quoting Nathan v. Municipality of Anchorage, 955 P.2d 528, 533 (Alaska App.1998))).
We therefore conclude that application of the exclusionary rule for violations of section 901.211 cannot be justified. Given *34 the legislature's specific attention to the issue of remedies, it would be overreaching to read a remedy into the statutory scheme when that remedy was not recognized or authorized by the legislature.

IV. CONCLUSION
Although the search of Jenkins, which was consistent with the requirements of the Fourth Amendment, violated section 910.211, suppression of the evidence obtained in the search was not a proper remedy. The denial of Jenkins' motion to suppress was not erroneous. We therefore affirm Jenkins' judgment and sentence.
Pursuant to article V, section 3(b)(4), Florida Constitution, and Florida Rule of Appellate Procedure 9.030(a)(2)(A)(vi), we certify that our decision is in direct conflict with D.F.
Affirmed; conflict certified.
WALLACE, J., and THREADGILL, EDWARD F., Senior Judge, Concur.
NOTES
[1] The provisions of section 901.211(2) with respect to arrests for "traffic, regulatory, or misdemeanor offense[s]" have no application here, since the arrest of Jenkins was for a felony drug offense. We note that statutes similar to section 901.211 have been read as governing only searches of persons arrested for the nonfelony offenses referred to in subsection (2). See Jenkins, 82 Conn.App. 111, 842 A.2d at 1155 (holding that statutory provisions similar to section 901.211 "do not address those strip searches that are conducted incident to a lawful arrest on a felony charge"). Under this interpretation, none of the provisions of the statute would have any application to persons arrested for felony drug offenses. Such a reading places a limitation on the scope of the statute that is inconsistent with the broad definition of "strip search" in subsection (1) and the other provisions of the statute which by their terms apply to all searches that constitute strip searches within the meaning of the statutory definition.
[2] We also note that since no written authorization was obtained for the search, it appears that the requirement of section 901.211(5) was not satisfied.
[3] In State v. Augustine, 724 So.2d 580, 580 (Fla. 2d DCA 1998), a case in which we held that there was no violation of section 901.211 in a "routine strip search" conducted "upon [the defendant's] booking into the county jail," we nonetheless expressed our agreement with the conclusion of D.F. concerning application of the exclusionary rule to evidence obtained in the course of a strip search performed in violation of section 901.211. On this point we stated, in dicta: "The appropriate remedy for a strip search conducted in violation of the statute is the suppression of the evidence obtained therefrom." Id. at 581.