978 So.2d 116 (2008)
Donald Eldrenal JENKINS, Petitioner,
v.
STATE of Florida, Respondent.
No. SC06-839.
Supreme Court of Florida.
March 6, 2008.
*117 James Marion Moorman, Public Defender, and Carol J.Y. Wilson, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, Robert J. Krauss, Bureau Chief, and Katherine Coombs Cline, Assistant Attorneys General, Tampa, FL, for Respondent.
LEWIS, C.J.
This case is before the Court to review the decision of the Second District Court of Appeal in Jenkins v. State, 924 So.2d 20 (Fla. 2d DCA 2006). The district court certified that its decision is in direct conflict with the decision of the Fourth District Court of Appeal in D.F. v. State, 682 So.2d 149 (Fla. 4th DCA 1996). We have *118 jurisdiction. See art. V, § 3(b)(4), Fla. Const.

FACTS AND PROCEDURAL HISTORY
On January 15, 2003, Kellie Daniel, a narcotics officer for the Tampa Police Department, was working with a confidential informant (CI). The CI offered to call an individual identified only as "D" to order a quantity of cocaine. The CI informed Officer Daniel that he had previously ordered drugs from D and possessed a phone number for D; however, the CI provided Daniel with only a very imprecise description of D as a tall, black male. The CI presented Officer Daniel a phone number for D written on a piece of paper and then proceeded to use Daniel's cell phone to call that number. Officer Daniel heard only one side of the conversation[1] in which the CI placed an order for cocaine and then asked that D make the delivery at a gas station located at an intersection in an area of Tampa that is well known for drug activity. The CI advised Officer Daniel that D would be at the gas station in fifteen minutes, and he would be driving a "brown boxy 4-door Chevy."
Officer Daniel transported the CI to the designated gas station with the understanding that the CI would remove his hat when he identified D arriving at the designated location. Officer Daniel parked her vehicle across the street from the location, keeping the CI in view at all times. When Jenkins drove into the gas station, the CI ran across the street toward the police vehicle yelling, "That's him, that's him." Officer Daniel testified that Jenkins was driving a "[b]ox Chevy-ish car. It's like a brown boxy Chevy, a car like that."[2] Through a radio transmission, Officer Daniel notified the other officers at the scene that she observed an individual matching D's description, and that the CI had advised her that the individual in the boxy brown car was D. At that time, all officers approached the brown vehicle.
Officer Todd Rego ordered Jenkins out of the vehicle at gunpoint and placed him in handcuffs. As these events were unfolding, the CI was taken across the street, where he confirmed to officers that Jenkins was definitely the individual known to him as D. Officer Kevin Bonollo then searched the brown vehicle and found a cell phone, but no contraband. Bonollo then conducted a pat down of Jenkins which produced currency, but, again, no drugs were disclosed. According to Bonollo, Sergeant Graham then "gave me permission to look inside his [Jenkins'] clothing, pull his pants back, do what I need to do." Jenkins was wearing baggy blue jeans with a low-hanging waist, and this allowed Bonollo to see that Jenkins was wearing boxer type shorts as an undergarment. Bonollo proceeded to pull the top of the boxer-shorts away from Jenkins' waist area and he then observed that "inside his [Jenkins'] butt crack sticking up was a sandwich bag . . . and it was twisted. The dope, the crack cocaine was at the bottom."[3] Officer Bonollo removed the sandwich *119 bag, and Jenkins was arrested and charged with possession of cocaine and possession of cocaine with intent to sell.
Jenkins filed a motion to suppress all evidence discovered as a result of this stop and search, asserting that (1) the police lacked reasonable suspicion to detain him; (2) there was no basis to conduct a pat down for weapons, and the search which revealed the bag between his buttocks was unreasonable; (3) the police lacked probable cause to search the vehicle; and (4) the search violated section 901.211 of the Florida Statutes (2002), which governs strip searches.
During the hearing on the motion to suppress, Jenkins provided a description of the search that revealed the crack cocaine which differed from that presented by Officer Bonollo. According to Jenkins, Officer Bonollo "ordered me to pull down my pants and bend over, and that's when they went into my buttocks." Jenkins testified that the officers "grabbed me from each side, pulled me over and bent me down," and that his buttocks were completely naked during the search.
With regard to the CI, Officer Daniel testified that she had used the CI in prior "search warrant buys," and on three or four prior occasions she had utilized him in similar "page-outs"; i.e., circumstances in which the CI ordered a quantity of cocaine for delivery to a specified location. Officer Daniel reported that each of these "page-outs" had resulted in an arrest. Officer Daniel testified that on one other occasion an arrest did not occur because the individual who was allegedly delivering the drugs "got spooked[,] tossed [the CI] out of the car," and drove away.
The trial court denied the motion to suppress, concluding that under the facts presented, the officers had probable cause to search both Jenkins and the vehicle. The trial court concluded that exigent circumstances existed to justify a warrantless search by virtue of the mobility of his vehicle and "the small quantity and the small amount of time that the police had in order to take custody of him." The trial court also stated that "what is typically called a strip search" did not occur in this case.[4] Jenkins subsequently pled guilty to possession of cocaine with intent to sell or deliver and specifically reserved his right to appeal the denial of the motion to suppress.
The Second District Court of Appeal affirmed. See Jenkins v. State, 924 So.2d 20 (Fla. 2d DCA 2006). The Second District first held that under the totality of the circumstances the officers had probable cause to arrest Jenkins, concluding that "the reliance of the police on the information provided by the informant was supported both by the informant's prior performance as a reliable source and by the corroboration of the informant's predictions concerning the behavior of the defendant." Id. at 24-25. The Second District further concluded that even though the search preceded the arrest of Jenkins, the search was valid as a search incident to arrest because probable cause existed to arrest Jenkins at the time of the search. See id. at 25 (citing Rawlings v. Kentucky, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)).
The Second District next held that the scope and manner of the search were reasonable under the Fourth Amendment. See id. at 26. According to the Second *120 District, although the search of Jenkins may have invaded his privacy, it was "less invasive than a strip search in which some or all of the subject's clothing is removed. . . . In determining the reasonableness of the search, it is of course important that no private part of Jenkins' body was exposed to public view." Id.[5] The Second District further noted that the officers engaged in a more intrusive search only after initial efforts to locate narcotics on Jenkins or in his vehicle were unsuccessful. See id. The officers had probable cause to believe that Jenkins arrived at the gas station to sell narcotics, and the Second District concluded that the officers "were justified in conducting the further search of Jenkins' person to prevent the disposal of the cocaine." Id.
The Second District then addressed whether the search violated section 901.211 of the Florida Statutes and concluded that pulling the waist area of the boxer shorts by Officer Bonello qualified as a "strip search" under the statute. See id. at 28. The Second District concluded that the search of Jenkins violated the provision of section 901.211 requiring that "[e]ach strip search . . . be performed . . . on premises where the search cannot be observed by persons not physically conducting or observing the search," and also the provision that requires written authorization from the supervising officer on duty before conducting a strip search. Id. at 29 & n. 2 (quoting § 901.211(3), Fla. Stat.).
With regard to application of the exclusionary rule to the evidence discovered during the search in violation of the statute, the Second District first noted that the exclusionary rule is a remedy for constitutional violations. Therefore, whether to apply the rule when a state statute is violated "is a matter of statutory interpretation""[t]he question is . . . whether a particular statutory scheme authorizeseither expressly or by implicationthe exclusion of evidence for a statutory violation." Id. at 30. The Second District held that the exclusionary rule does not apply to violations of section 901.211 because "the legislature explicitly addressed the issue of remedies in section 901.211(6) but failed to make any mention of the exclusion of evidence as a remedy." Id. at 32.
The Second District recognized that the exclusionary rule had previously been applied upon the violation of certain statutes that were silent concerning this remedy. The Second District referred to State v. Johnson, 814 So.2d 390 (Fla.2002), in which this Court held the exclusionary rule to be generally applicable to violations of a statute governing disclosure of confidential medical records, but not when there has been a good faith effort to comply with the statute. See Jenkins, 924 So.2d at 31-32. In concluding that this Court's decision in Johnson did not control under the facts presented here, the Second District reasoned that Johnson did not establish a broadly applicable exclusionary rule for all statutory violations. See id. at 32. Further, the Second District also distinguished application of the exclusionary rule to violations of the "knock-and-announce" requirement of section 933.09 of the Florida Statutes (2005) because that statutory context must be understood in the context of the deep-seated common law and Fourth Amendment concerns presented by unannounced entries. See id.
The Second District certified conflict between its decision here and D.F. v. State, *121 682 So.2d 149 (Fla. 4th DCA 1996), in which the Fourth District held that suppression of evidence is the appropriate remedy for violation of the strip search statute. See Jenkins, 924 So.2d at 30, 34. The Second District disagreed with reliance on Gulley v. State, 501 So.2d 1388 (Fla. 4th DCA 1987), in this section-901.211 context because the statutory scheme at issue in Gulley, which governed DUI blood tests, contained specific provisions which required the exclusion of evidence obtained in that context. See Jenkins, 924 So.2d at 31. The Second District articulated that the application of the exclusionary rule in connection with a specific statutory provision does not support the application of the same rule in a different statutory context where there is no explicit basis for application of that rule. See id.

ANALYSIS
When this Court has accepted jurisdiction in a case to resolve a legal conflict, "we may, in our discretion, consider other issues properly raised and argued." Savoie v. State, 422 So.2d 308, 310 (Fla. 1982). Before we resolve the single issue upon which conflict has been certified, it is necessary to address two other issues  whether law enforcement officers had probable cause here to arrest Jenkins, and whether the search of Jenkins was unreasonable under the Fourth Amendment. The determination of these issues is necessary because, if we conclude that the arrest or the search of Jenkins was in violation of the Florida or United States Constitutions, exclusion of the evidence may be required as the remedy for the constitutional violation, and the strip search statutory remedy issue will no longer be the controlling issue.

The Existence of Probable Cause
The Fourth Amendment to the United States Constitution and section 12 of Florida's Declaration of Rights guarantee citizens the right to be free from unreasonable searches and seizures. The Florida Constitution now expressly provides that the right shall be construed in conformity with the Fourth Amendment to the United States Constitution, as interpreted by the United States Supreme Court. See art. I, § 12, Fla. Const. Items obtained in violation of the Florida constitutional protection are excluded from evidence if such items would be excluded pursuant to the jurisprudence of the United States Supreme Court. See id.
The United States Supreme Court has held that an arrest is unreasonable under the Fourth Amendment if it is not supported by probable cause. See Michigan v. Summers, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). The concept of probable cause was explained in the following reasoning:
The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. And this means less than evidence which would justify condemnation or conviction, [but] more than bare suspicion: Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.
Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (internal quotation marks, citations, and footnotes omitted). The High Court has further explained:
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions *122 about human behavior; jurors as factfinders are permitted to do the same  and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
. . . [P]robable cause is a fluid concept  turning on the assessment of probabilities in particular factual contexts  not readily, or even usefully, reduced to a neat set of legal rules.
Illinois v. Gates, 462 U.S. 213, 231-32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Whether probable cause to support a valid arrest exists when based upon a tip from a confidential informant is to be determined from the totality of the circumstances. See id. at 230-31. An informant's veracity, reliability and basis of knowledge are highly relevant considerations in the determination of whether probable cause exists, and "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability":
If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity  which if fabricated would subject him to criminal liability  we have found rigorous scrutiny of the basis of his knowledge unnecessary.
Id. at 233-34, 103 S.Ct. 2317 (citation and footnote omitted). Additionally, the credibility of information from an informant that a suspect is engaged in illegal activity is enhanced where the informant is able
to predict [a suspect's] future behavior, because it demonstrate[s] inside information  a special familiarity with [the suspect's] affairs. . . . Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.
Alabama v. White, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Finally, the United States Supreme Court has generally instructed that determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). However, the court should review findings of historical fact only for clear error and give due weight to inferences drawn from those facts by resident judges and local law enforcement officers. See id.
This Court has previously applied the totality of the circumstances criteria to determine whether a tip from a confidential informant was sufficient to establish probable cause. In State v. Butler, 655 So.2d 1123 (Fla.1995), this Court considered the following facts:
[A]t about 11:30 p.m. on April 25, 1992, Officer Putnam was contacted by a known confidential police informant. Putnam had used information from this informant on at least twenty occasions since February 1, 1992, and sixty to seventy percent of these tips had resulted in felony arrests. The informant told Putnam that a black male, about 5' 10" tall, wearing a black jacket, white t-shirt, and blue jeans, was selling powdered cocaine on the sidewalk in front of *123 726 West Beaver Street, a location known to Putnam to be part of an area with a high volume of street level drug sales. Putnam had seized crack cocaine two months earlier at this exact location. The informant told Putnam that the described drug seller wrapped cocaine inside rolled-up one-dollar bills and placed them in his pants pocket, ready to sell.
Within fifteen minutes of receiving this tip, Putnam and another officer saw Butler standing on the sidewalk in front of 726 West Beaver Street, Butler's clothes and appearance exactly matched the description given by the informant, and Putnam noted that the only other person located in the vicinity did not meet this description. Putnam then approached Butler who initially turned as if to walk away, but then stopped. Putnam patted Butler down on the outside of his clothing and felt a large, soft bulge in Butler's left front pants' pocket, which he believed to be money. Putnam asked Butler about the bulge, and Butler responded that it was twenty-eight one-dollar bills. Putnam then reached into Butler's pocket and retrieved the folded money (i.e., twenty-seven or twenty-eight bills), but found no cocaine. However, when Putnam reached into the pocket again, he retrieved another folded dollar bill which contained powdered cocaine as the informant had described. Putnam then formally took Butler into custody.
Id. at 1124-25. Under these facts, we held that probable cause existed for law enforcement to take the defendant into custody:
In this case, we have an informant whose veracity (i.e., credibility and reliability) is unquestioned. Officer Putnam had used information from this informant at least 20 times, and 60 to 70% of the tips resulted in felony arrests. As the district court acknowledged, the informant's reliability is "fairly well established." . . .
As the district court correctly notes, the informant's tip did not contain the precise basis of his knowledge. However, the informant's tip did provide an abundance of overall detail. The informant told the police the following information about Butler: his height (5' 10"), race (African-American), type of clothing (black jacket, white t-shirt, and blue jeans), location (on the sidewalk in front of 726 Beaver Street), type of drugs sold (cocaine), location of drugs sold (pants pocket), and method of delivery (rolled-up one-dollar bills). . . . [A] sufficient basis of personal knowledge may be inferred from the wealth of detail that the informant provided.
In addition . . . it is possible to infer personal knowledge from the detail of the informant's description of the manner of packaging of the drugs and their exact location on Butler's person. . . . Further, any weakness on this issue may be bolstered in part by the strong showing of the informant's prior veracity.
[W]e conclude that the seemingly innocent activity observed here could be used by the police to verify the informant's tip. Within minutes of receiving the tip, the police corroborated every item in the tip except the ultimate determination of whether Butler had any drugs on his person. . . . There were also other "circumstances within the Officer's knowledge" that, while perhaps not significant in isolation, appear to bolster a probable cause determination: the house in front of which Butler was standing was a house from which Putnam had seized crack cocaine two months earlier and was located in a "high drug area," and, upon arriving at the scene of the arrest, Putnam observed *124 Butler turn and attempt to walk up a set of stairs.
Id. at 1130-31 (citations omitted).
We conclude that Butler controls the instant case, and that the officers here had probable cause to believe that Jenkins was involved in the commission a crime. Accordingly, the officers had probable cause to arrest. The facts elicited during the evidentiary hearing established that the CI, a known informant, had been used by Officer Daniel on "search warrant buys"; i.e., drug purchases utilized to establish the probable cause necessary to obtain search warrants, and also on three or four prior "page-outs," each of which resulted in an arrest.[6] Further, Officer Daniel testified that other officers had also utilized this CI with positive results. Although the CI here had not provided information to law enforcement on as many occasions as the CI in Butler, we nonetheless conclude that the CI here provided information leading to an arrest on a sufficient number of occasions to establish his reliability.
Further, the CI demonstrated that he had personal knowledge of the drug activities of Jenkins. As we have noted, the CI informed Daniel that he possessed the phone number of a person referred to as "D" who sold cocaine, and that the CI had previously purchased cocaine from D. The CI presented a phone number to Daniel which belonged to D. The CI then initiated a drug transaction with D in the presence of the police by contacting D on the cell phone of Officer Daniel. Officer Daniel observed that the line on her cell phone was activated (indicating that the CI was not simply pretending to order drugs). Officer Daniel heard the CI discuss the drug transaction and advise D to meet him at a specified gas station in an area of Tampa that is known for drug activity. The CI then advised Officer Daniel that D would arrive at the station in approximately fifteen minutes and further described the car he would be driving as a boxy brown four-door vehicle.
In conformity with the conduct predicted by the CI, a boxy, brown four-door vehicle subsequently arrived at the gas station. Although an event such as this standing alone may normally represent only an innocent detail, the fact that a described vehicle operated by a described person arrived at the exact gas station named by the CI in the precise time frame specified by the CI was properly utilized by law enforcement to verify the information provided. Moreover, the identity of Jenkins as the drug dealer known as D was confirmed when the CI ran across the street identifying Jenkins as D by shouting, "That's him, that's him." Thus, the officers in the instant case were able to corroborate every item of information provided by the CI except the ultimate determination of whether Jenkins actually had drugs on his person. Given the totality of the circumstances presented, we conclude that law enforcement had probable cause to believe that Jenkins arrived at the gas station with the intent to consummate a drug transaction.
Our recitation of these facts undermines the conclusion of the dissent that the only bases asserted to establish probable cause were that (1) the CI had participated in only three or four "page-outs" which led to *125 arrests, and (2) the CI only provided a vague description of D and a general description of the vehicle he drove. See dissenting op. at 131. The CI in this case did not merely allege to police officers that Jenkins was a drug dealer and that a drug deal might occur. Rather, the CI actually orchestrated a drug transaction with D in the presence of a law enforcement officer. As previously noted, the CI used the officer's telephone to call Jenkins, order drugs, and arrange a specific location for delivery of the drugs. Moreover, when Jenkins arrived at the specified location, the CI then expressly confirmed to Officer Daniel at the scene that Jenkins was in fact D, a drug dealer with whom the CI had previously conducted drug transactions. The presence of the CI at the gas station to confirm the identity of D prevented the possibility that "any black male driving a boxy, brown car could have been stopped and searched" based upon the information provided by the CI. See dissenting op. at 131. This intimate involvement of the CI with the drug transaction, and with law enforcement, causes us to conclude that the CI here was equally, if not more, reliable than the CI in Butler, who merely informed officers that the defendant was selling drugs in front of a specific address.
The presence of the CI at the scene further enhances the reliability of the information provided because he could be held accountable should the information ultimately prove to be false. See United States v. Valentine, 232 F.3d 350, 355 (3d Cir.2000) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." (alteration in original) (quoting United States v. Salazar, 945 F.2d 47, 50-51 (2d. Cir. 1991))). In addition, the presence of the CI at the scene even subjected him to potential retaliation because Jenkins arguably would know the identity of the CI who informed law enforcement that Jenkins possessed drugs with the intent to conduct a transaction at that location. Cf. United States v. Christmas, 222 F.3d 141, 144 (4th Cir.2000) ("By informing the police about her neighbors' illegal activity, the informant exposed herself to the risk of reprisal. The fact that she provided the report to uniformed police officers in public only increased the probability that someone associated with the illegal activity would witness her aid to the police.").
Given the totality of these circumstances present at the time of Jenkins' arrest, a number of which are not considered by the dissenting analysis, we conclude that after Jenkins was identified by the CI as D, it was completely reasonable for the officers to believe that Jenkins was engaged in the commission of a criminal offense. Accordingly, we conclude that the arrest of Jenkins was proper under the Fourth Amendment.

The Validity of the Search
The United States Supreme Court has held that searches incident to a lawful arrest are constitutionally permissible and reasonable under the Fourth Amendment. See United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a `reasonable' search under that Amendment."). The justification for such searches is not only to disarm a suspect, but also to preserve evidence on the defendant's person for later use at trial. See id. at 234, 94 S.Ct. *126 467; see also Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) ("[W]hen an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession."). Further, it is permissible for a search incident to arrest to be conducted prior to the actual arrest, provided that probable cause to arrest existed prior to the search, and the fruits of the search were not necessary to establish probable cause. See Rawlings v. Kentucky, 448 U.S. 98, 111 & n. 6, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). Nonetheless, a search incident to arrest is still subject to a standard of reasonableness. See generally Illinois v. Lafayette, 462 U.S. 640, 646, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("[A] search incident to arrest would hardly justify disrobing an arrestee on the street."). According to the United States Supreme Court:
The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
In this case, Jenkins contends that the scope and the manner of the search that occurred here were both unreasonable under the Fourth Amendment. He contends that the police disrobed him in a public place to recover drugs. Applying the four elements enunciated in Wolfish, we disagree that this search of Jenkins violated the Fourth Amendment. First, as noted by the trial court, Jenkins was not "strip searched" in the manner in which that term is commonly understood, nor in the manner Jenkins claims. According to the testimony of the law enforcement officers, Jenkins was not required or forced to lower his trousers and boxer shorts in public while the officers conducted a search.[7] Rather, a single officer merely pulled the boxer shorts away from his body at the waist area and looked inside to discover the cocaine. Further, even though this search did occur at a public place, a gas station which Officer Daniel admitted was conducting business,[8] there *127 is no indication that any private body parts or the buttock area became publicly exposed. Additionally, the officers did not touch Jenkins' buttocks; rather, the bag containing drugs was simply removed from his boxer shorts.[9]Cf. Amaechi v. West, 87 F.Supp.2d 556, 564-65 (E.D.Va.2000) (search violated Fourth Amendment where suspect "was essentially paraded out to a public street with a half-buttoned night dress on  exposing a significant portion of her nude body  and intrusively searched up and down in plain view of her husband, children, and neighbors").
The dissent suggests that this search was unnecessarily and unreasonably demeaning to Jenkins and an egregious violation of his Fourth Amendment rights. See dissenting op. at 132, 133-34. However, the trial court credited the testimony of law enforcement over that of Jenkins, and we are not permitted to second guess the credibility assessments of the trial court. See generally Ornelas, 517 U.S. at 699, 116 S.Ct. 1657 ("[A] reviewing court should take care . . . to review findings of historical fact only for clear error.").
Based upon these findings, in our view nothing equivalent to a strip search occurred in the instant case. Rather, the search here qualifies as a "reach-in" search, where the suspect remains clothed during the search and the suspect's genitals are not visible to onlookers. See United States v. Williams, 477 F.3d 974, 977 (8th Cir.), cert. denied, ___ U.S. ___, 128 S.Ct. 237, 169 L.Ed.2d 181 (2007).[10] As described in the credible evidence, Officer Bonollo merely pulled back Jenkins' boxer shorts, which were already exposed to public view, looked down into Jenkins' buttocks area, viewed approximately two inches of the plastic bag protruding up from between Jenkins' buttocks, and retrieved the bag.[11] Logistically speaking, unless a civilian was standing immediately adjacent to Officer Bonollo, a highly unlikely possibility not supported by the evidence here, there is no way that he or she would have been able to view Jenkins' buttocks. Thus, the contention that Jenkins was subject to an embarrassing and humiliating search in public is simply inconsistent with the facts as determined by the trial court.
Finally, the record reflects that law enforcement proceeded to look in the boxer shorts only after an initial frisk and search of Jenkins' person and his vehicle failed to reveal drugs. Based upon the tip provided *128 by the CI, which had been verified by Jenkins arriving at the gas station at the time and in a vehicle described by the CI, and the identification of Jenkins as D, a drug dealer, the officers had probable cause to believe that Jenkins arrived at the station for the purpose of selling cocaine to a buyer. When the initial searches of the vehicle and person did not reveal contraband, it was only then that the supervisor gave Bonollo permission to "look inside his clothing, pull his pants back." It is not unknown or in any way unusual that drug dealers frequently hide contraband in their undergarments in an attempt to evade discovery of the unlawful substances during routine searches.[12] Therefore, we conclude that Officer Bonollo was justified when, with the approval of his supervisor, he pulled back the waist area of the boxer shorts to look for drugs.
In light of the foregoing, we conclude that under the balancing test announced by the United States Supreme Court in Wolfish, and the four factors that we must consider in evaluating the reasonableness of a search, the very limited intrusion into Jenkins' clothing was clearly outweighed by the need for law enforcement to retrieve the contraband before it could be discarded or destroyed by Jenkins. Therefore, we hold that this search incident to this arrest was not unreasonable under the Fourth Amendment.

Section 901.211 and the Exclusionary Rule
Under federal case law, when it is determined that a search has not violated the Fourth Amendment, the issue of whether the evidence discovered in violation of a statute is subject to suppression is to be determined based upon legislative intent. The Supreme Court in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), has clearly explained that whether evidence obtained in violation of a federal wiretapping statute must be suppressed when no constitutional violation has occurred does not turn on the exclusionary rule, which is aimed at deterring violations of Fourth Amendment rights, but upon the provisions of the specific statute. See id. at 524, 527, 94 S.Ct. 1820. Relying on Giordano, the United States Circuit Court of Appeals, Sixth Circuit, has held that a violation of the Vienna Convention does not require the suppression of evidence where no constitutional violation has occurred. See United States v. Page, 232 F.3d 536, 540 (6th Cir.2000). In reaching this conclusion, the Sixth Circuit compared the Vienna Convention to a statute and determined that the exclusionary rule is an inappropriate sanction absent any underlying constitutional violations unless the treaty expressly provided for that remedy. See id.; see also United States v. Abdi, 463 F.3d 547, 550 (6th *129 Cir.2006) ("Because we find that suppression is not an appropriate remedy for violation of the administrative warrant requirement of 8 U.S.C. § 1357(a)(2), and that Abdi's Fourth Amendment rights were not violated by his public warrantless arrest based on probable cause, we conclude that the district court erred when it suppressed Abdi's statements and the derivative evidence.").
In Davis v. State, 529 So.2d 732 (Fla. 4th DCA 1988), the Fourth District relied upon federal law when it concluded that "it is appropriate to look to the terms of the statute and the intentions of the legislature, rather than to invoke judge-made exceptions to judge-made rules" when faced with allegations of a statutory violation and a request to suppress evidence. Id. at 733 (quoting United States v. Spadaccino, 800 F.2d 292, 296 (2d Cir.1986)). The Fourth District in Davis ultimately held that because the legislature had unequivocally announced its intention to suppress evidence obtained in violation of chapter 934, Florida Statutes (1985), a good faith exception did not apply to violations of this chapter. See 529 So.2d at 734-35. ("By setting forth in unequivocal language that the suppression of evidence is the consequence of an illegal wiretap, the Legislature removed from judicial purview, the authority to alter the statutory scheme by creating a good faith exception."). In State v. Garcia, 547 So.2d 628, 630 (Fla.1989), we approved the Fourth District's opinion in Davis.
It is under this precedent that we address whether the exclusionary rule is a remedy for a violation of the strip-search statute presented here. The statute provides:
(1) As used in this section, the term "strip search" means having an arrested person remove or arrange some or all of his or her clothing so as to permit a visual or manual inspection of the genitals; buttocks; anus; breasts, in the case of a female; or undergarments of such person.
(2) No person arrested for a traffic, regulatory, or misdemeanor offense, except in a case which is violent in nature, which involves a weapon, or which involves a controlled substance, shall be strip searched unless:
(a) There is probable cause to believe that the individual is concealing a weapon, a controlled substance, or stolen property; or
(b) A judge at first appearance has found that the person arrested cannot be released either on recognizance or bond and therefore shall be incarcerated in the county jail.
(3) Each strip search shall be performed by a person of the same gender as the arrested person and on premises where the search cannot be observed by persons not physically conducting or observing the search pursuant to this section. Any observer shall be of the same gender as the arrested person.
(4) Any body cavity search must be performed under sanitary conditions.
(5) No law enforcement officer shall order a strip search within the agency or facility without obtaining the written authorization of the supervising officer on duty.
(6) Nothing in this section shall be construed as limiting any statutory or common-law right of any person for purposes of any civil action or injunctive relief.
§ 901.211, Fla. Stat. (2005). As noted in footnote one, the State disputes whether section 901.211 even applies to Jenkins because subsection (2) refers only to "traffic, regulatory, or misdemeanor offense[s]." § 901.211(2), Fla. Stat. However, *130 we need not address today whether this statute applies to felonies such as that with which Jenkins was charged. Regardless of which and whether certain offenses fall under the statute, it is clear that the plain language of section 901.211 does not expressly provide for exclusion of evidence as a remedy for a violation of the statute.[13] The only reference to remedies in the statute before us is located in subsection (6), and those remedies are civil and injunctive in nature. Therefore, we conclude that the exclusionary rule is not a remedy for a violation of section 901.211 unless a constitutional violation has also occurred.[14]
The dissent asserts that we should hold that the exclusionary rule applies to section 901.211 because "[t]he exclusion of the evidence in this case would further the goal of deterrence of further police misconduct, one of the major goals of the exclusionary rule." Dissenting op. at 134. While there is no doubt that application of the exclusionary rule to section 901.211 would deter violations of this statute  indeed, this is the goal of the exclusionary rule, see Arizona v. Evans, 514 U.S. 1, 14, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (noting that the exclusionary rule was historically designed as a means of deterring police misconduct)  the benefits of the exclusionary rule are totally irrelevant when a court determines whether the rule applies to a specific state statute in the absence of a constitutional violation. Although we may prefer that evidence obtained in violation of a specific statute, such as the strip search statute, be subject to exclusion, the remedies for violation of this statute fall within the purview of the Legislature. Section 901.211 does not expressly list the exclusionary rule as a remedy and, therefore, we do not infer that this remedy is available for violations of the statute  regardless of its effectiveness as a deterrent or how desirable or beneficial we believe exclusion may be. See Giordano, 416 U.S. at 524, 527, 94 S.Ct. 1820; Page, 232 F.3d at 540.

CONCLUSION
Based upon the foregoing, we approve the decision of the Second District that the police had probable cause to arrest Jenkins, that the search of Jenkins was valid under the Fourth Amendment, and that the exclusionary rule does not apply to violations of section 901.211 of the Florida *131 Statutes. We further disapprove the decision in D.F.
It is so ordered.
WELLS, ANSTEAD, CANTERO, and BELL, JJ., concur.
QUINCE, J., dissents with an opinion, in which PARIENTE, J., concurs.
QUINCE, J., dissenting.
I cannot agree with the majority that the search of Jenkins under the facts and circumstances of this case did not violate section 901.211, Florida Statutes (2003), and was not unreasonable under the Fourth Amendment. When using the "totality-of-the-circumstances approach," laid out by the United States Supreme Court, one looks at the veracity, reliability, and basis of knowledge of a confidential informant to determine whether probable cause exists. Illinois v. Gates, 462 U.S. 213, 230-31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The majority believes that the informant in Jenkins met this test and probable cause existed. I disagree and question whether the confidential informant was reliable enough to establish probable cause.
The majority says that Butler controls, yet in Butler the police used the confidential informant "at least 20 times" with "60 to 70% of the tips resulting in felony arrests." State v. Butler, 655 So.2d 1123, 1130 (Fla.1995). I question whether the confidential informant in this case, who had been used three to four times, provided the same level of reliability that an informant used successfully twenty times provides. Moreover, the informant here gave an imprecise, vague description of a tall, black man, did not give the police Jenkins' name, and only gave a general description of the car. In addition the informant never revealed the basis of his knowledge other than saying he previously had bought drugs from the person. Regardless of the fact that a man matching a vague description drove into the gas station in a car matching a general description given by the informant, the police failed to corroborate or verify any of the information contained in the tip. In fact, even though the police had a general description of the car, the informant was wrong about the make of the car. See majority op. at 118, note 2.
Applying the United States Supreme Court's reasoning that probable cause "deal[s] with probabilities . . . on which reasonable and prudent men, not legal technicians, act," it is possible to conclude that a reasonable person could find probable cause when a tip leads to someone who fits the information given. Illinois v. Gates, 462 U.S. at 231, 103 S.Ct. 2317 (quoting Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). However, it is troublesome that the police did not corroborate any of the information prior to detaining and arresting Jenkins. To that end, any black male driving a boxy, brown car could have been stopped and searched based on the information provided by the informant.
Even if the police had sufficient probable cause to arrest Jenkins, the search was unreasonable. The majority is correct in applying the four factors enumerated by Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in order to determine whether or not the search was reasonable. See Id. at 559, 99 S.Ct. 1861 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."). However, when these factors are applied to Jenkins' search, I conclude that the search was unreasonable.
I find the scope and manner of the search to be egregious and invasive. The *132 Second District says that "[t]he search was less invasive than a strip search" and that "no private part of Jenkins' body was exposed to public view." Jenkins v. State, 924 So.2d 20, 26 (Fla. 2d DCA 2006). While the district court is correct that the search was not as invasive as a total body strip search, it was still invasive because it involved a police officer pulling back Jenkins' pants, reaching inside his pants, and removing an object from his buttocks. Further, the facts are silent as to who surrounded Jenkins when the search occurred and the record reflects that a female officer was present. Even if no body part was exposed, "[t]he statute requires that a strip search be performed out of public view, not merely that the areas of the body enumerated in subsection (1) be shielded from public view." Id. at 29. Section 901.211 requires that the police do more than just prevent body parts from being exposed. Here, the search was performed in public view and thus violated the statute.
Several courts in other jurisdictions have found similar searches conducted in public places to be unreasonable. In State v. Walker, No. 97APA09-1219, 1998 WL 429121, at * 1-3 (Ohio Ct.App. July 28, 1998) (unpublished decision), appeal dismissed, 84 Ohio St.3d 1433, 702 N.E.2d 1212 (1998), the defendant experienced a search under similar circumstances: the police used a confidential informant, conducted a pat down that revealed nothing, conducted the search in a parking lot, and pulled back the defendants' pants. The Ohio appellate court concluded that "based on the intrusive nature of the search, involving the officer's use of rubber gloves to reach inside the defendant's pants and remove drugs from the defendant's private areas . . . the public search of the defendant in a parking lot exceeded the scope of a reasonable search." Id. at *10.
Likewise in this case, the scope of the intrusion is unreasonable because of the nature of the search and where it was conducted. Officer Bonollo testified that he "opened up the defendant's boxer shorts and inside his butt crack . . . [he] could see the top of the plastic [sandwich bag sticking up] about two inches." Jenkins, 924 So.2d at 23. Other than that statement, the record does not paint a clear picture of what happened. We do not know if the officer conducting the search wore gloves, the manner in which he "opened up" Jenkins' underwear, how much privacy Jenkins' received, or if the location of the search was private.
Moreover, the location where the police performed the search is problematic. The majority agrees with the Second District that because no body parts were exposed, the fact that the search occurred at a public location is irrelevant. However, other courts have held that strip searches are impermissible in a public place unless there are conditions that make it impossible to move the accused to a private location.[15] The police searched Jenkins at a gas station situated on a busy intersection rather than taking him to a private location or police station to strip search him. Jenkins, 924 So.2d at 26. There were eight to ten officers present and in the interest of preserving Jenkins' privacy and dignity, clearly one or two could have escorted him to a police station where a *133 proper search could have been conducted. Even the United States Supreme Court has expressed concern about the location where a police search is conducted. See Illinois v. Lafayette, 462 U.S. 640, 645, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("Police conduct that would be impractical or unreasonable  or embarrassingly intrusive  on the street can more readily  and privately  be performed at the station."). While the record does not reflect whether the gas station where the search of Jenkins occurred was well lit or what time of day it was, we do know that there was a medium amount of traffic and people were conducting business at the station while the search was taking place.
In Paulino v. State, 399 Md. 341, 924 A.2d 308 (Md.), cert. denied, ___ U.S. ___, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007), where police searched the defendant in a car wash, the Court of Appeals of Maryland held a body search unreasonable due to "the location of the search and the lack of exigency." Id. at 317.[16] It may be a reasonable search, however, if the police conduct such a strip-type search in a private location. The Eighth Circuit found a similar search reasonable because the police moved the defendant to a more private location before conducting a strip search, after a pat down showed there was something in the defendant's pants. See United States v. Williams, 477 F.3d 974, 977 (8th Cir.), cert. denied, ___ U.S. ___, 128 S.Ct. 237, 169 L.Ed.2d 181 (2007).[17] Jenkins' search, which was conducted at a busy business, was clearly a humiliating intrusion upon Jenkins' dignity.
I also question the justification for the search, the last factor articulated by the United States Supreme Court in Wolfish. Searches incident to an arrest are constitutionally allowed and are reasonable under the Fourth Amendment. See United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Further, searches are permissible in order to preserve evidence. Id. at 234, 94 S.Ct. 467. This Court has held that searches are justifiable when "the exigent circumstances justifying quick action are destruction of incriminating evidence within the reach of the arrested individual." Hornblower v. State, 351 So.2d 716, 718 (Fla.1977) (citing Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).
However, one has to balance "the need for the particular search against the invasion of personal rights that the search entails." Wolfish, 441 U.S. at 559, 99 S.Ct. 1861. In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the United States Supreme Court said searches are allowed when police arrest a defendant in order "to remove any weapons that the [arrestee] might seek to use in order to resist arrest . . . and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." Id. at 763, 89 S.Ct. 2034.[18] There were no *134 exigent circumstances requiring the police to search Jenkins at that very instant at the gas station. Similar to the defendant in Paulino, there was no risk that Jenkins was going to try to destroy the evidence.[19] Nor is there anything in the record to show that the evidence would have been destroyed in the time required to drive Jenkins to a police station where a proper search could have been performed. There is no reason why Jenkins had to be searched at that particular time and in such a demeaning manner. Because it was possible for the police to have escorted Jenkins to a station for a proper strip search, they should have done so. Instead the police violated section 901.211 and subjected Jenkins to a degrading, embarrassing, and public experience. Jenkins' search was unreasonable and for that reason, I respectfully dissent.
The majority also concludes that exclusion of the evidence is not a proper remedy for a violation of section 901.211. I disagree and believe that the Fourth District in D.F. v. State, 682 So.2d 149 (Fla. 4th DCA 1996), decided this issue correctly. As the court in D.F. noted, there was "no intent on the part of the legislature to limit the court's ability, in the appropriate case, to suppress the results of a strip search obtained in violation of the statute." Id. at 153. The statutory language concerning a defendant's right to seek civil and injunctive remedies should not be read as a limitation on the courts' ability to impose other sanctions. The exclusion of the evidence in this case would further the goal of deterrence of future police misconduct, one of the major goals of the exclusionary rule.
PARIENTE, J., concurs.
NOTES
[1] Officer Daniel, however, testified during the hearing on the motion to suppress that she saw D's number register on her phone as the CI dialed, and she further noted that the line was activated when the CI spoke on the phone. After Jenkins was taken into custody, the cell phone retrieved from Jenkins' car registered the receipt of a call from Officer Daniel's cell phone number at the pertinent time.
[2] During the evidentiary hearing, it was revealed that Jenkins was actually driving a Pontiac; however, another responding officer, Keven Bonollo, described the vehicle as a "larger, older model brown 4-door."
[3] The Criminal Report Affidavit signed by Officer Daniel indicates that 5.9 grams of rock cocaine was recovered from Jenkins.
[4] This statement led the Second District Court of Appeal to conclude that "the trial court credited the testimony of the officers concerning the manner in which the search was performed and discredited Jenkins' testimony." Jenkins v. State, 924 So.2d 20, 25-26 (Fla. 2d DCA 2006).
[5] In reaching this determination, the Second District specifically noted that its review of whether the search was reasonable would be based upon the "historical facts found to exist by the trial court." Id. at 26 (citing Ornelas v. United States, 517 U.S. 690, 696-97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).
[6] Although on one occasion, the CI's tip did not result in an arrest because the suspect became "spooked" and drove off, we agree with the decision of the Second District that this does not substantially undermine the reliability of the CI. See Jenkins, 924 So.2d at 25 ("The fact that a prior transaction was not consummated because the suspect involved in that transaction became suspicious and bolted does not indicate that the information provided by the informant was unreliable.").
[7] In analyzing the facts of this case, we recognize that as a reviewing court we review "findings of historical fact only for clear error." Ornelas, 517 U.S. at 699, 116 S.Ct. 1657. We further agree with the Second District that "the trial court credited the testimony of the officers concerning the manner in which the search was performed and discredited Jenkins' testimony." Jenkins, 924 So.2d at 25-26. Therefore, in our analysis, we similarly accept the testimony of the officers.
[8] Although somewhat unclear from the hearing on the motion to suppress and the opinion of the district court, Jenkins appears to have been moved before the search. During the evidentiary hearing, Jenkins testified that the officers moved him away from the gas station before conducting the search, stating "[Officer Bonollo] asked me to the back of the car. They moved me from the Texaco and go to the RX and made me come to the side of the back of the truck and ordered me to pull down my pants and bend over." This statement was corroborated by another officer who testified that "[e]veryone was moved from the Texaco across the street to Rosalita drug store. That's where everything took place." However, Officers Daniel and Bonollo provided no testimony with regard to a movement of Jenkins prior to the search. Thus, the record is somewhat unclear with regard to whether Jenkins was moved before he was searched.
[9] Officer Bonollo testified, "I didn't put my hand in his buttocks. It was a pretty large sandwich baggie, like you put a sandwich in and it was sticking out. So I went inside his boxers, correct, but I didn't go inside his buttocks."
[10] This type of public search is permissible "if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy." Williams, 477 F.3d at 977; cf. United States v. Ashley, 37 F.3d 678, 682 (D.C.Cir.1994) (search of underwear constitutionally permissible where police officer followed suspect outside of the bus station to the side of the station, and stood in front of suspect during search); State v. Jenkins, 82 Conn.App. 111, 842 A.2d 1148, 1158 (2004) (reach-in search upheld where police searched suspect on side of a restaurant, away from public view, by pulling underwear away from suspect's body to retrieve drugs).
[11] Thus, the instant case is clearly distinguishable from Paulino v. State, 399 Md. 341, 924 A.2d 308, 315-16(Md.), cert. denied, ___ U.S. ___, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007), upon which the dissent places great emphasis, in which the officers conducted a public visual body-cavity search of the defendant, who was lying on the ground, by spreading the cheeks of his buttocks and inspecting his anal cavity.
[12] See, e.g., United States v. Cofield, 391 F.3d 334, 337 (1st Cir.2004) (stating that "Officer Hearns knew that narcotics dealers often carry narcotics and weapons concealed in their undershorts" and noting that "[i]t is common knowledge that controlled substances often are concealed on the person of users and dealers alike" (quoting Burns v. Loranger, 907 F.2d 233, 238-39 (1st Cir.1990))); United States v. Rodney, 956 F.2d 295, 297-98 (D.C.Cir.1992) (detective testified that "his colleagues make up to 75 percent of their drug recoveries from around the crotch area"); United States v. Perdue, 427 F.Supp.2d 671, 673-74 (W.D.Va.2006) ("The practical knowledge and experience of Officer [Kent] Daniel included the following pertinent information: . . . when encountered by law enforcement, those in possession of drugs frequently attempt to hide them in or about their buttocks."), aff'd, No. 06-4555, 228 Fed.Appx. 269, 2007 WL 1493842 (4th Cir. May 21, 2007); Parker v. Commonwealth, 255 Va. 96, 496 S.E.2d 47, 53 (1998) ("Officer Kurisky knew, from personal experience, that `people often try to hide contraband in their shorts, in their crotch area or in their buttocks area.'").
[13] Cf. § 934.01(2), Fla. Stat. (2006) ("In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of intrastate commerce, it is necessary for the Legislature to define the circumstances and conditions under which the interception of wire and oral communications may be authorized and to prohibit any unauthorized interception of such communications and the use of the contents thereof in evidence in courts and administrative proceedings." (emphasis supplied)).
[14] Below, the Second District correctly noted that this Court has held that the exclusionary rule applies to certain statutes which are silent as to remedy for their violation. See, e.g., State v. Johnson, 814 So.2d 390 (Fla.2002) (exclusionary rule applies to willful violation of statute governing confidentiality of patient medical records); Benefield v. State, 160 So.2d 706 (Fla. 1964) (exclusionary rule applies to violation of "knock and announce" statute); see also §§ 395.3025(4), Fla. Stat. (1997); 901.19(1), Fla. Stat. (1961). But see Hudson v. Michigan, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (holding that violation of "knock and announce" rule does not require exclusion of all evidence found in a search). On the other hand, section 901.211(6) makes explicit reference to civil and injunctive remedies. Since the Legislature chose to reference these remedies in the statute, we must assume that the Legislature intended to exclude all other remedies. Therefore, it would be inappropriate for this Court to read a judicially created remedy into the statute.
[15] See, e.g., United States v. Bazy, Nos. 94-40018-01-SAC, 94-40018-02-SAC, 1994 WL 539300, at *8 (D.Kan. Aug.29, 1994) ("Probable cause that an arrestee is hiding something on his body does not justify conducting on a public street a strip search or some search akin to one. There must be other circumstances present which prevent an officer from waiting until the arrestee can be moved to a private location, like the station house."), aff'd, 82 F.3d 427, 1996 WL 165344 (10th Cir.1996).
[16] In Paulino, a confidential informant told a police detective that the defendant possessed drugs, the manner in which he concealed the drugs, and the defendant's location. Police arrived at the defendant's location, a well lit car wash, lifted up the defendant's shorts, spread his buttocks and retrieved the drugs. Although twelve police officers were present, no attempt was made to transfer the defendant to a police facility prior to the search. Id. at 310-12.
[17] The Eighth Circuit stated the officers "decided not to search [the defendant] while on the street because they were concerned about his privacy. Instead, they took [him] into custody, placed him in a squad car, and drove him several blocks to the police department's Fourth Precinct building." Id. at 975.
[18] Even though Chimel involved a search conducted in a person's home, it is still applicable here because the United States Supreme Court discussed the need to search the "person" and did not restrict its analysis to a search of dwellings.
[19] The Court of Appeals of Maryland reasoned that "[d]uring the transportation of Paulino from the scene of the arrest to the station or to a more private location, the police had the ability to secure Paulino to prevent his destruction or disposal of the contraband found on his person." Paulino, 924 A.2d at 320.