65 So.3d 502 (2011)
STATE of Florida, Petitioner,
v.
Anthony L. HANKERSON, Respondent.
No. SC10-1074.
Supreme Court of Florida.
April 21, 2011.
As Revised on Denial of Rehearing June 30, 2011.
Pamela Jo Bondi, Attorney General, Tallahassee, FL, James J. Carney and Mark *503 J. Hamel, Assistant Attorneys General, West Palm Beach, FL, for Petitioner.
Carey Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Respondent.
CANADY, C.J.
The State seeks review of Hankerson v. State, 32 So.3d 175 (Fla. 4th DCA 2010), in which the Fourth District Court of Appeal reversed Anthony L. Hankerson's conviction for possession of cocaine for sale, holding that the trial court should have granted Hankerson's motion to suppress evidence obtained from a search undertaken without probable cause. In its decision, the Fourth District refused to consider the State's argument on appeal that the evidence was legally discovered following a proper investigatory stop because the theory had not been raised in the trial court. The Fourth District's refusal to consider the State's theory expressly and directly conflicts with Dade County School Board v. Radio Station WQBA, 731 So.2d 638, 645 (Fla.1999), which held that "an appellee, in arguing for the affirmance of a judgment, is not limited to legal arguments expressly asserted as grounds for the judgment in the court before." We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. We conclude that the Fourth District improperly curtailed the State's argument on appeal and that the trial court properly determined that the search was based on probable cause. We therefore quash the Fourth District's decision.

I. BACKGROUND
After being charged with possession of cocaine with intent to sell within 1000 feet of a school, Hankerson filed a motion to suppress evidence, asserting that the evidence was obtained from an illegal search and seizure. Specifically, Hankerson asserted that the law enforcement officer who searched him lacked probable cause to believe that he had committed a felony. At the hearing on the motion to suppress, the State contended that the search was properly based on probable cause and presented testimony from two law enforcement officers.
Officer Mark Lucas, of the Delray Beach Police Department, testified that on the afternoon of February 28, 2008, he participated in the surveillance of a residence that, based on information from residents of the neighborhood and confidential informants, was suspected of being the location of illegal drug transactions. Officer Lucas explained that he observed Hankerson arrive at the residence, exit an SUV, and approach a group of people on the front porch. While looking up and down the street, Hankerson opened his hand. Each of three individuals on the porch consecutively took something from Hankerson's handOfficer Lucas could not see what the objects wereand "quickly" gave him paper currency in return. Hankerson's contact with the individuals was "[v]ery brief." Hankerson put the money in his pocket, returned to the SUV, and left. Officer Lucas testified that he had worked with the Delray Beach Police Department's street-level narcotics unit for eleven years and that based on his surveillance that afternoon and his years of experience, he believed that Hankerson had participated in a narcotics transaction. According to Officer Lucas, "that brief of a contact, the limited eye contact, the way [Hankerson] was looking up and down the street, and the exchange of paper currency for these items with three different subjects" was consistent with the hundreds of illegal drug transactions he had witnessed as a law enforcement officer. Because Officer Lucas believed that Hankerson had participated in an illegal drug transaction, he *504 radioed to other officers, requesting that they perform a traffic stop of Hankerson.
Officer James Schmidt, of the Delray Beach Police Department, testified that on the afternoon of February 28, 2008, at the direction of Officer Lucas, he used his lights and sirens to pull over a vehicle driven by Hankerson. As he approached the vehicle, Officer Schmidt observed Hankerson reach toward the center console and then down toward the floor. When Officer Schmidt asked Hankerson to exit the vehicle, Hankerson complied. Office Schmidt asked Hankerson if he had any drugs or weapons. Hankerson stated that he was "out of the game" and lifted his shirt to show his torso. Officer Schmidt asked Hankerson if he had anything in his shoes. Before Officer Schmidt could ask Hankerson to remove his shoes, Hankerson began doing so. Officer Schmidt testified that Hankerson appeared "a little bit hesitant." Hankerson began to remove his right shoe and then removed his left shoe instead. When Hankerson did take off his right shoe, he attempted to conceal in his hand a bag that had been in his shoe. The bag contained small, zip-top bags filled with a substance that Officer Schmidt suspected was cocaine. Officer Schmidt arrested Hankerson and field-tested the substance in the bags, which tested positive for cocaine. Officer Schmidt testified that based on his experience, each of the small bags had a street value of about twenty dollars. Officer Schmidt further testified that he found sixty-three dollars in Hankerson's right front pocket.
The trial court denied Hankerson's motion to suppress. The trial court found that Officer Lucas had "probable cause to believe that he saw a narcotic transaction, even though he could not identify the substance" and that "all of the other facts and circumstances give cause for the subsequent search of Mr. Hankerson." After a jury trial, Hankerson was convicted of one count of the lesser included offense of possession of cocaine for sale and sentenced to ten years in state prison.
Hankerson appealed his conviction and sentence to the Fourth District. Hankerson asserted that because Officers Lucas and Schmidt did not have probable cause to search him, the trial court should have granted his motion to suppress. In response, the State offered two theories as to why the trial court did not err in denying the motion to suppress. The State contended that the officers did have probable cause to search Hankerson and, alternatively, that Officer Schmidt discovered the evidence as a result of a lawful investigative stop pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which was followed by Hankerson's voluntary removal of his shoes.
Relying on Coney v. State, 820 So.2d 1012, 1013-15 (Fla. 2d DCA 2002) (holding there was no probable cause to search where law enforcement officers observed the defendant engage in a single hand-to-hand transaction in an area known for drug activity), the Fourth District concluded that the trial court erred in finding that the officers had probable cause to search Hankerson. As to the State's theory that Officer Schmidt merely conducted an investigatory stop, the Fourth District explained that it did not consider that argument because the State had not raised that theory in the trial court.
The State petitioned this Court for review of the Fourth District's decision on the basis of express and direct conflict. We granted review based on conflict with Radio Station WQBA, which held that an appellee need not have previously raised a basis for affirming the trial court's decision in order to assert that position on appeal.

*505 II. ANALYSIS
In the analysis that follows, we first address the conflict between the Fourth District's decision and our decision in Radio Station WQBA. We then explain why the trial court did not err in denying Hankerson's motion to suppress.
In Radio Station WQBA, this Court resolved a conflict regarding whether a trial court's ruling could be affirmed based on a theory or principle of law that was not argued to the trial court. This Court adhered to the principle generally known as the "tipsy coachman" rule, explaining that a trial court's ruling "will be upheld if there is any basis which would support the judgment in the record." Radio Station WQBA, 731 So.2d at 644.
This Court then further explained that because a trial court's ruling must be affirmed where the record supports any legal basis for the judgment, an appellee may raise an argument on appeal that was not raised in the trial court so long as the argument has a reasonable basis in the record.
If an appellate court, in considering whether to uphold or overturn a lower court's judgment, is not limited to consideration of the reasons given by the trial court but rather must affirm the judgment if it is legally correct regardless of those reasons, it follows that an appellee, in arguing for the affirmance of a judgment, is not limited to legal arguments expressly asserted as grounds for the judgment in the court below. It stands to reason that the appellee can present any argument supported by the record even if not expressly asserted in the lower court. See MacNeill v. O'Neal, 238 So.2d 614, 615 (Fla.1970). In MacNeill, this Court cited prior cases holding that an appellee "not aggrieved by the lower court's decision need not file cross-assignments of error in order to have the points considered on appeal." See Cerniglia v. C & D Farms, Inc., 203 So.2d 1 (Fla.1967); Hall v. Florida Bd. of Pharmacy, 177 So.2d 833 (Fla.1965). "These cases recognize that a party who is content with the judgment below need not assign error in order to support that judgment and is not limited in the appellate courts to the theories of recovery stated by the trial court." MacNeill, 238 So.2d at 615. While the Rules of Appellate Procedure no longer provide for assignments of error, what the MacNeill court said is analogous to saying that an appellee need not raise and preserve alternative grounds for the lower court's judgment in order to assert them in defense when the appellant attacks the judgment on appeal.
Id. at 645. In brief, this Court concluded that the reviewing court may not preclude an appellee from raising an alternative basis to support the trial court's ruling solely because the argument was not preserved.
We adhere to our decision in Radio Station WQBA on this point. A trial court's ruling should be upheld if there is any legal basis in the record which supports the judgment. It follows that to aid the appellate court in its task, the appellee should be permitted to explicate any legal basis supporting the trial court's judgment. Accordingly, the Fourth District erred in refusing to consider the State's argument on appeal that Hankerson voluntarily removed his shoes following a proper investigatory stop.
We need not, however, consider the merits of the State's investigatory-stop theory because we conclude that the trial court correctly accepted the State's argument that the officers had probable cause to search Hankerson. See PK Ventures, Inc. v. Raymond James & Assocs., Inc., *506 690 So.2d 1296, 1297 n. 2 (Fla.1997) ("Once a court obtains jurisdiction, it has the discretion to consider any issue affecting the case.").
Law enforcement officers have probable cause to conduct a search where "`the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." State v. Betz, 815 So.2d 627, 633 (Fla.2002) (alteration in original) (quoting Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). The United States Supreme Court has expressly stated that a law enforcement officer "may draw inferences based on his own experience in deciding whether probable cause exists." Ornelas v. United States, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). The Supreme Court has further explained that probable cause is a "fluid conceptturning on the assessment of probabilities in particular factual contextsnot readily, or even usefully, reduced to a neat set of legal rules." Maryland v. Pringle, 540 U.S. 366, 370-71, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The "standard of probable cause" is "only the probability, and not a prima facie showing, of criminal activity." Gates, 462 U.S. at 235, 103 S.Ct. 2317 (quoting Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)).
In reviewing a trial court's ruling on a motion to suppress, the appellate courts defer to the trial court's factual findings so long as the findings are supported by competent, substantial evidence, and review de novo the legal question of whether there was probable cause given the totality of the factual circumstances. Twilegar v. State, 42 So.3d 177, 192 (Fla. 2010), cert. denied, ___ U.S. ___, 131 S.Ct. 1476, 179 L.Ed.2d 315 (2011). Having reviewed the evidence presented at the hearing on Hankerson's motion to suppress, we agree with the trial court's conclusion that Hankerson's actions on the afternoon of February 28, 2008, would have led a person of reasonable caution to believe that Hankerson had committed a criminal offense.
While a probable cause determination generally is so "multi-faceted" that "one determination will seldom be a useful `precedent' for another," Ornelas, 517 U.S. at 698, 116 S.Ct. 1657 (quoting Gates, 462 U.S. at 238 n. 11, 103 S.Ct. 2317), the district courts of appeal have found probable cause to exist in cases involving similar factual circumstances. For example, in Knox v. State, 689 So.2d 1224, 1225 (Fla. 5th DCA 1997), the district court determined that the arresting officers had probable cause to search Knox after observing him, while in an area suspected to be the site of illegal drug transactions, engage in a series of transactions during which he leaned into a vehicle and gave the occupant a small object in exchange for cash. In that case, one of the officers testified that based on his experience, the observed transactions were consistent with illegal drug transactions.
Similarly, in Revels v. State, 666 So.2d 213, 214-15 (Fla. 2d DCA 1995), the district court determined that the arresting officers had probable cause to search the defendant where the officers observed a man exit a home known to be the site of illegal drug transactions, approach Revels, and place a small object in Revels' left hand while Revels held cash in his right hand. Revels was the third person observed that day to have arrived at the house to engage in such a transaction. As *507 in Knox, one of the officers testified that the "overall transaction was very similar to numerous other cocaine transactions that he had witnessed prior to this arrest." Id. at 214.
Here, Hankerson arrived at a home that had been the subject of complaints about drug activity and engaged in a series of hand-to-hand transactionsexchanging a small item for paper currencythat Officer Lucas described as consistent with hundreds of illegal drug transactions that he had observed.
In addition, Officers Lucas and Schmidt testified about specific details of Hankerson's behavior and demeanor that supported the trial court's conclusion that the officers had probable cause to believe that Hankerson had engaged in criminal activity. Officer Lucas testified that rather than making eye contact, Hankerson looked up and down the street as he interacted with three of the individuals on the porch and that Hankerson's contact with the individuals was very brief. See Williams v. State, 717 So.2d 1109, 1109 (Fla. 5th DCA 1998) (concluding that officer had probable cause to conduct search where in a location known for frequent drug sales, the defendant looked to see if anyone was watching before extracting a small item from the buttocks area of his pants and exchanging it for an unknown item).
We disagree with the Fourth District's conclusion that the instant case was so factually similar to Coney as to require suppression of the evidence. In Coney, two law enforcement officers, who were conducting surveillance in an area where many drug arrests previously had been made, observed Coney approach a car and put his closed hand into the car. As the car left, the officers "saw that Coney held money." Coney, 820 So.2d at 1013. The officers could not see what had been in Coney's hand but testified that based on their training and experience, they believed that they had observed a drug transaction. The district court concluded that the officers did not have probable cause to search Coney based on their observation of "a single suspicious event." Id. at 1014-15. Notably, in the instant case, the law enforcement officers observed a series of quick exchanges with three separate individuals, not a single transaction. Officer Lucas saw Hankerson offer several small objects on his open palm to the individuals on the porch, whereas the officers in Coney merely saw the defendant reach into a car with a closed hand. And finally, while Officer Lucas testified that Hankerson repeatedly examined his surroundings rather than making eye contact with the individuals on the porch, Coney does not include any discussion of the defendant's demeanor during the suspected drug transaction.
When considered in their totality, the factual circumstances of this case support the trial court's conclusion that Officers Lucas and Schmidt had probable cause to search Hankerson. Accordingly, the trial court did not err in denying Hankerson's motion to suppress.

III. CONCLUSION
Based on the foregoing, we quash the Fourth District's decision and remand for proceedings consistent with this opinion.
It is so ordered.
LEWIS, QUINCE, POLSTON, and LABARGA, JJ., concur.
PARIENTE, J., dissents with an opinion, in which PERRY, J., concurs.
PARIENTE, J., dissenting.
I dissent for two reasons. First, I question the majority's acceptance of jurisdiction *508 in this case on a basis that is not dispositive of the substantive issue that it addresses. Second, and more importantly, while the facts establish reasonable suspicion for the officer to have engaged in an investigatory stop of Hankerson, I dissent because the majority expands the circumstances under which probable cause would support a search after an officer observes suspected hand-to-hand drug transactions that occur within a matter of seconds. In doing so, the majority fails to enunciate proper guidelines to assist lower courts in these very fact-specific cases and also relies on district court decisions that are materially distinguishable from the case under review.
There is no question that sufficient facts existed to support Officer Lucas's objectively reasonable suspicion that Hankerson was involved in drug dealing. However, these facts simply do not rise to the level of the necessarily higher threshold of probable cause to believe that Hankerson had committed a crime. See Baptiste v. State, 995 So.2d 285, 291 (Fla.2008) ("Reasonable suspicion is a less demanding standard than probable cause. . . ." (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990))). I believe that we would be hard-pressed to find a neutral magistrate who would issue a search warrant based on facts related by Officer Lucas at the suppression hearing. If the facts could not support the issuance of a warrant, they certainly cannot justify a warrantless search. See United States v. Ross, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ("The scope of a warrantless search based on probable cause is no narrowerand no broaderthan the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize.").
Reduced to their essence, the operative facts of this case are as follows. Officer Lucas, an experienced narcotics officer, attended homeowners' meetings at which he received hearsay information that the location in question was a source of drugs. The officer also mentioned receiving information from confidential informants regarding this residence, but he did not relay any history of their reliability. The officer himself did not know Hankerson, nor had anyone identified Hankerson as a drug dealer. No prior arrests had been made at this location. The critical surveillance during which Hankerson exchanged money for items "very small in nature" lasted a matter of "seconds." Finally, in the course of this exchange, Hankerson made limited eye contact and looked up and down the street. While certainly suspicious, these facts are simply not enough to establish probable cause to conduct a search.
The reason for ensuring that we have a uniform standard for evaluating cases involving surveillance of a suspected hand-to-hand drug transaction was compellingly explained by the Second District Court of Appeal:
There are some citizens who fear that the Fourth Amendment has become a victim in the war against drugs. . . . [W]e emphasize that society's legitimate fear of crack cocaine and the ease with which small quantities of this drug can be concealed are not valid reasons to dilute the Fourth Amendment probable cause standard.
Revels v. State, 666 So.2d 213, 217 (Fla. 2d DCA 1995). The difference between reasonable suspicion and probable cause under the Fourth Amendment is critical to ensure that citizens are protected from unreasonable searches and seizures. With probable cause, the officer has the basis not only to arrest the individual but to *509 search the individual without any further showing. See Jenkins v. State, 978 So.2d 116, 126 (Fla.2008) ("[I]t is permissible for a search incident to arrest to be conducted prior to the actual arrest, provided that probable cause to arrest existed prior to the search, and the fruits of the search were not necessary to establish probable cause."). Whereas with reasonable suspicion, the State must make additional showings in order to justify a search following an investigatory detention and, absent such showings, reasonable suspicion cannot form the basis for an arrest.
As we explained in Popple v. State, 626 So.2d 185, 186 (Fla.1993), there are three levels of police-citizen encounters. The first level is categorized as a "consensual encounter," during which the citizen is free to leave, there is minimal police contact, and Fourth Amendment protections are not triggered. Popple, 626 So.2d at 186. Under the second and third levels, however, constitutional safeguards are invoked. The second level involves an "investigative stop," during which a police officer may temporarily detain a person only if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. Id. The third level concerns an "arrest" and must be supported by probable cause to believe a crime has been or is being committed. Id. In my view, the majority's holding blurs the line between the second and third levels.
In light of the critical distinction between reasonable suspicion and probable cause, and the abundance of case law stemming from lower court decisions dealing with situations similar to the one we address in this case,[1] I believe it is necessary for this Court to enunciate proper guidelines to assist the lower courts in applying Fourth Amendment principles to these very fact-specific scenarios.
While all Fourth Amendment cases use a "totality of the circumstances" analysis in determining whether probable cause exists to justify a search, I would adopt the guidelines set forth in Revels to provide a degree of uniformity in this imprecise area of the law in order to distinguish between those circumstances establishing probable cause and those establishing the lower threshold of reasonable suspicion.
In Revels, after examining a line of cases with similar drug-transaction surveillance, the Second District formulated a list of six factors that Florida courts have commonly considered in determining whether observations of such transactions create reasonable suspicion or probable cause:
These cases demonstrate the great difficulty, if not impossibility, involved in delineating the minimum factual basis necessary to establish probable cause under all the circumstances of a drug surveillance operation. These cases do disclose at least six factors that are commonly evaluated at suppression hearings *510 to determine whether the evidence proves probable cause or merely reasonable suspicion in the context of such surveillance.
1. The Training and Experience of Law Enforcement. See Doctor v. State, 596 So.2d 442 (Fla.1992). A well-trained officer with years of drug experience is not necessarily more credible than any other police officer. However, such an officer is more likely to know what to observe and to distinguish innocent behavior from incriminating behavior. See, e.g., P.L.R. v. State, 455 So.2d 363, 364 (Fla.1984) (officer observed that manila envelopes were used to store nickel bags of marijuana in over 100 occasions). . . .
2. The Quality of the Surveillance Procedures. A well-controlled surveillance operation with good visibility and with adequate methods to both obtain and preserve evidence allows the state to present detailed proof at the suppression hearing. . . .
3. The History of the Specific Location Under Surveillance. Rumor and reputation are no substitute for fact. Actual proof of ongoing or recent drug activity at a specific location is far more likely to assist in establishing probable cause than a general belief that an entire street or neighborhood is a "high drug area.". . . .
4. Recent Events at the Location. The fact that drugs were sold at a location last month may not necessarily indicate that drugs will be sold there tomorrow. . . . Detailed information proving prior sales to other persons immediately preceding the arrest may establish the difference between reasonable suspicion and probable cause. . . .
5. Prior Knowledge of the Parties Involved. If the police develop information prior to an arrest concerning the parties' involvement with drugs, that information may help transform reasonable suspicion into probable cause. . . .
6. A Detailed Description of the Entire Event. The case law is replete with instances in which one or two factual details observed by an officer transforms reasonable suspicion into probable cause. Likewise, case law includes examples of premature arrests made before enough circumstances have occurred to establish probable cause. Whenever an officer recalls a detail on the witness stand that is not in his or her arrest report, the officer's credibility becomes a significant issue. Although an officer specializing in drug offenses may be more observant of critical evidence, the many transactions that he or she observes must make it difficult to recall each transaction with detail. Thus, detailed testimony of the event, buttressed by a timely written arrest report containing those details, is often critical at a suppression hearing.
Revels, 666 So.2d at 216-17 (citation omitted); see also Strickroth v. State, 963 So.2d 366, 369 (Fla. 2d DCA 2007) ("Factors supporting a finding of probable cause include (1) evidence of the officers training and experience in drug investigations; (2) well-planned and well-controlled surveillance procedures; (3) actual proof of the areas history of drug activity; (4) detailed proof of prior drug sales immediately preceding the arrest; (5) prior knowledge of a suspects involvement in drug activity; and (6) a detailed written arrest report that confirms factual details that establish probable cause.").
A thorough application of these guidelines would serve to protect citizens against unreasonable searches and seizures while ensuring adequate police protection. In fact, other district courts have subsequently recognized these factors as *511 significant in determining whether an officer's observation of a hand-to-hand transaction creates reasonable suspicion or probable cause. See, e.g., Chaney v. State, 956 So.2d 535, 539 (Fla. 4th DCA 2007) ("Florida courts have considered several factors to be significant in determining whether observation of a hand-to-hand transaction created reasonable suspicion or probable cause. These factors include the experience and training of the officer in narcotics investigations, reputation of the location for drug activity, history of previous arrests from that site, prior knowledge of the suspects, quality and extent of surveillance, and detailed description of the event."); Huffman v. State, 937 So.2d 202, 206 (Fla. 1st DCA 2006) (noting factors that may be considered in determining whether an officer had a reasonable suspicion of criminal activity to justify "the investigatory stop" include "the officer's narcotics experience; the reputation of the location for drive-up transactions; the extended period of the surveillance; and the history of previous, multiple arrests from that site" (quoting Burnette, 658 So.2d at 1171)).
As the Second District did in Revels, I would apply those guidelines here and would also urge appellate courts to analyze these types of cases by employing similar standards. In applying the Revels guidelines to the facts of this case, while it is certainly clear that the officers possessed the requisite level of training and experience in the field and gave a detailed description of the entire event, it is also equally clear that the officers lacked actual proof of ongoing or recent drug activity at the specific location in question and had not developed information prior to Hankerson's arrest concerning the parties' involvement with drugs. There was no indication that the officers knew Hankerson's identity or the identity of any of the individuals to whom he allegedly sold drugs. Thus, applying the factors identified in Revelsa decision upon which the majority relies to affirm the trial court's finding of probable causeleads to the conclusion that the totality of facts and circumstances present here supports a finding of reasonable suspicion, not probable cause.
In applying these factors, it is helpful to underscore their importance in relation to the decisions upon which the majority relies: Revels, 666 So.2d at 216-17, Knox v. State, 689 So.2d 1224 (Fla. 5th DCA 1997), and Williams v. State, 717 So.2d 1109 (Fla. 5th DCA 1998). The majority criticizes the Fourth District for relying on Coney v. State, 820 So.2d 1012, 1013-15 (Fla. 2d DCA 2002), in which the Second District found no probable cause where officers observed the defendant engage in a single hand-to-hand transaction characterized by the district court as a "single suspicious event." However, Revels, Knox, and Williams are materially distinguishable from this case and are not properly relied upon for support of the majority's holding.
For instance, in Revels, two experienced narcotics officers observed a specific house known to be in a location where crack cocaine was sold. Revels, 666 So.2d at 214. In contrast to this case, the officers' knowledge about the location "was not based on rumor or hearsay, but on the fact that the police had made numerous narcotics arrests for transactions occurring at the house." Id. (emphasis added). Before arresting the defendant, the officers monitored the house for at least a few minutes, and while doing so, "observed two separate events in which cars pulled up to the curb in front of the house." Id. (emphasis added). On both occasions, the officers observed hand-to-hand transactions in which currency was exchanged for an unidentified object. Id. Within ten minutes of these transactions, the defendant arrived at the same location on his bicycle. *512 Id. A man from the residence walked over to the defendant and gave him a small object in exchange for money. Id. At the defendant's suppression hearing, the police officer who made these observations testified that "the overall transaction was very similar to numerous other cocaine transactions that he had witnessed prior to this arrest." Id.
In contrast, in this case, Officer Lucas's suspicions of the residence in question appeared to be unconfirmed; he did not make prior narcotics arrests for transactions occurring at the house. Further, Officer Lucas did not witness individuals engage in separate transactions beforehand; rather, the officer witnessed Hankerson conduct "very brief" and "consecutive[ ]" contact with three individuals, lasting merely "seconds" in total.
In Knox, prior to conducting a search of defendant Knox, officers observed him for a period of two hoursan important fact that the majority omits. In the Knox case, law enforcement officers experienced in narcotics identification and arrests were assigned to conduct surveillance within the vicinity of a discount beverage store where numerous complaints of narcotics dealings had been previously lodged. Knox, 689 So.2d at 1225. During that two-hour time period, officers witnessed Knox engage in several transactions; he approached vehicles and passed "something" to the vehicles' occupants in exchange for cash. Id. Although the items exchanged were too small to be seen, one officer testified that "this conduct was consistent with his experience observing narcotics transactions elsewhere." Id. The Fifth District concluded "from the totality of the circumstances that the officers' observation of Knox's conduct during the two-hour surveillance established sufficient probable cause for an experienced officer to believe that Knox was engaged in criminal conduct that justified a search for illegal drugs." Id. (emphasis added). As I stressed above when distinguishing the instant case from Revels, unlike in Knox, the "series of transactions" Officer Lucas observed were consecutive exchanges that lasted only "seconds" in total; it simply was not an ongoing or lengthy observation on the part of Officer Lucas.
The majority also places too much emphasis on Williams for the proposition that Hankerson's demeanor during this exchange (i.e., his lack of eye contact and his looking up and down the street) supports the trial court's finding of probable cause. In contrast to this case, in Williams, the Fifth District concluded that probable cause existed when an experienced narcotics officer observed the defendant, "who was known to the officer as one who hangs out on the streets and ha[d] been subject to various arrests," extract a small item from the buttocks area "after looking around to assure himself that no one was watching" and exchange it for another unknown item. Williams, 717 So.2d at 1109 (emphasis added). In reaching this conclusion, Williams noted that the buttocks area is "an area that the officer recognizes as a hiding place for contraband." Id. Clearly, extracting a small item from the buttocks area is a salient factor far different than not making eye contact, which could have multiple, innocent explanations.
Even more noteworthy is the fact that the Williams decision cites to several of the factors the Second District found dispositive in Revels, including a location that was known for frequent drug sales due to "previous arrests" that took place there and that the defendant was "a person known to the officer as one who hangs out on the streets and ha[d] been subject to various arrests." Williams, 717 So.2d at 1109. Further, the Williams decision emphasized that the defendant was "well *513 known as a street person." Id. Here, there was no testimony that Hankerson was known by the officers as one subject to various arrests, nor was there testimony that this location was one at which "previous arrests" had been made.
Finally, the majority criticizes the Fourth District's reliance on the Coney decision, in which the Second District found probable cause to be lacking. The majority relies on three factors to distinguish that case from the facts we confront today: Officer Lucas observed a series of quick exchanges with three, separate individuals, not a single transaction; Officer Lucas observed Hankerson offer several small objects on his open palm as opposed to reaching into a car with a closed hand; and Officer Lucas referenced Hankerson's demeanor during the observed exchanges. See majority op. at 507. However, I cannot agree that those distinctions are meaningful enough to warrant a different outcome.
The police in Coney were conducting surveillance in an area where many drug arrests had previously been made. Coney, 820 So.2d at 1013. They observed Coney approach on a bicycle and place his closed hand into a car. Id. The police could not see what was in his hand, but as the car left, they saw Coney holding money. Id. From their training and experience, the officers believed they had seen a drug transaction. Id. The trial court agreed and denied Coney's motion to suppress. The Second District reversed, noting that the officers did not see what was in Coney's hand when he reached into the vehicle and did not see Coney involved in more than one transaction. Id. at 1014. Distinguishing the case before it from Revels, where officers observed two, separate hand-to-hand transactions in which a person sitting outside the house approached cars that pulled up to the curb, the Second District stressed that "the officers here observed a single suspicious event." Id. at 1014-15. In other words, "[w]hile the officers saw money in Coney's hand after the transaction, and while they had a [reasonable] suspicion that a crime might have occurred, they did not have probable cause to effect Coney's arrest." Id. at 1015.
Regardless of Hankerson's demeanor, which could have had many innocent explanations, or the fact that his palm was open instead of closed, which the majority indicates is of some significance, in my view, the Fourth District's reliance on Coney was not improper. Certainly, it was not a reason to quash the Fourth District's decision. Although Hankerson engaged in three transactionsor as the majority describes, a "series of quick exchanges with three separate individuals"they were not separate incidents of conduct. Majority op. at 507. Rather, this quick exchange, lasting only seconds in total, was in fact nothing more than "a single suspicious event," much like the conduct the district court found to be dispositive in Coney. Simply stated, when Hankerson approached the location in question, he exchanged items with a group of people consecutively, not with separate individuals at different points in time. Accordingly, I agree with the basis for the Fourth District's holding that probable cause did not exist:
[I]n this case [Officer] Lucas did not see what [the] defendant exchanged for money. [Officer] Schmidt did not see what was in his shoe. They did not see him similarly involved in more than one occasion. These patterns on which they rely also occur in innocent public transactions and are not unique to narcotics violations. These patterns may be enough to inform a suspicion for further investigationperhaps even enough for a Terry stop or a stop under the Florida *514 Stop and Frisk Lawbut they fall short of the requirements for probable cause. As in Coney, police did not have probable cause to search him without his consent.
Hankerson v. State, 32 So.3d 175, 177 (Fla. 4th DCA 2010) (footnotes omitted).
To conclude, in comparing the case at bar to Revels, Knox, and Williams, noticeably absent from the probable cause equation is actual proof of ongoing or recent drug activity at the residence where Officer Lucas first observed Hankerson (Revels' third factor), testimony providing detailed information proving sales to other persons immediately preceding the arrest (Revels' fourth factor), and evidence regarding the officer's prior knowledge of Hankerson's personal involvement with drugs (Revels' fifth factor). Therefore, while the majority properly relies on a talismanic, but nebulous, "totality of the circumstances" analysis, the facts support reasonable suspicion and not the more demanding Fourth Amendment requirement of probable cause. As a result, the State failed to meet its burden of proving that the officers had probable cause to search Hankerson, to request that he remove his shoes, or to seize the contents therein. Accordingly, as the Fourth District correctly observed, the trial court should have granted Hankerson's motion to suppress.
For all these reasons, I dissent.
PERRY, J., concurs.
NOTES
[1] See, e.g., Ray v. State, 40 So.3d 95 (Fla. 4th DCA 2010); Wallace v. State, 8 So.3d 492 (Fla. 5th DCA), review denied, 19 So.3d 312 (Fla.2009); Chaney v. State, 956 So.2d 535 (Fla. 4th DCA 2007); Strickroth v. State, 963 So.2d 366 (Fla. 2d DCA 2007); Huffman v. State, 937 So.2d 202 (Fla. 1st DCA 2006); Santiago v. State, 941 So.2d 1277 (Fla. 4th DCA 2006); Walker v. State, 846 So.2d 643 (Fla. 2d DCA 2003); Glover v. State, 843 So.2d 919 (Fla. 5th DCA 2003); Belsky v. State, 831 So.2d 803 (Fla. 4th DCA 2002); Ford v. State, 783 So.2d 284 (Fla. 2d DCA 2001); League v. State, 778 So.2d 1086 (Fla. 4th DCA 2001); State v. Gandy, 766 So.2d 1234 (Fla. 1st DCA 2000); D.A.H. v. State, 718 So.2d 195 (Fla. 2d DCA 1998); State v. K.S., 694 So.2d 104 (Fla. 5th DCA 1997); Burnette v. State, 658 So.2d 1170 (Fla. 2d DCA 1995); Walker v. State, 636 So.2d 583 (Fla. 2d DCA 1994) State v. Caicedo, 622 So.2d 149 (Fla. 3d DCA 1993); Elliott v. State, 597 So.2d 916 (Fla. 4th DCA 1992); Winters v. State, 578 So.2d 5 (Fla. 2d DCA 1991).